**Adeline M. BRUNO**

**v.**

**W.B. SAUNDERS COMPANY and CBS Educational and Professional Publishing, a division of CBS, Inc., Appellants.**

No. 88–1895.

United States Court of Appeals,
Third Circuit.

Argued April 17, 1989.

Decided Aug. 14, 1989.

Rehearing and Rehearing In Banc
Denied Sept. 8, 1989.

John J. McAleese, Jr. (argued), John H. Widman, McAleese, McGoldrick & Susanin, P.C., King of Prussia, Pa., for appellants.

Geoffrey P. Gompers (argued), Philadelphia, Pa., for appellee.

Before SEITZ,* SLOVITER and GREENBERG, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

The appeal in this Age Discrimination in Employment (ADEA) action, 29 U.S.C. § 621, *et seq.*, follows a jury verdict against the defendants W.B. Saunders Company (Saunders) and CBS Educational and Professional Publishing (CEPP) in the amount of $850,000. After the verdict, the district court, which had jurisdiction under 28 U.S.C. § 1331, denied the defendants' motion for judgment n.o.v. or in the alternative for a new trial. This court has appellate jurisdiction under 28 U.S.C. § 1291.

### I.

In relating the background of this case, we rely on uncontradicted testimony, except where noted. Adeline Bruno, the plaintiff in this case, was employed by W.B. Saunders Company from 1974 until May 1986. Saunders is a publisher of medical textbooks and medical periodicals, or "clinics." During the entire time relevant to this case, W.B. Saunders was a wholly owned subsidiary of CEPP.

Prior to the events out of which this litigation arose, Bruno was Director of Saunders' Central Order Processing Department. This position was described in Saunders' internal nomenclature as a "level 9" position. As Director of Central Order Processing, Bruno earned $44,350 annually as of December 1984.

In early 1984, Saunders announced plans to eliminate the Central Order Processing Department. One consequence of this would ultimately be the elimination of Bruno's job. Bruno was at the time forty-six years old.

Later that year, while Bruno was still working in her Central Order Processing job, the Manager of the Clinics Fulfillment Department at Saunders was transferred, and his job became open. Anthony Degutis, then Director of Budgets and Planning at Saunders, was given responsibility for finding a replacement. Within the Saunders hierarchy, the title "Manager" was a step below that of "Director," the title then held by Bruno. The newly open position was classified by Saunders as a "level 8" position. Bruno applied for the job.

The Clinics Fulfillment Department processes ("fulfills") orders for Saunders' clinics. From 1977 until it was computerized in 1980, the Clinics Fulfillment Department had been under the direction of Bruno in her capacity as Director of Central Order Processing. Degutis testified that his original belief was that Bruno "would best fill this position." Indeed, Degutis was informed by two CEPP executives in New York to whom Bruno had indirectly reported, Richard Bates and William Wright, that Bruno was the obvious successor to the Clinics Fulfillment position.

At the interviews conducted by Degutis, Beverly Dietrich, one of the ten candidates for the position, was treated differently from the others. Dietrich, who was then 36, was taken out by Degutis for a ninety minute lunch at an upscale restaurant near Saunders' office in Philadelphia. None of the other candidates was taken to a restaurant. Bruno was interviewed for approxi-

* Since the date of the argument in this case, Judge Seitz has taken senior status.

mately twenty minutes in a vacant office in the Saunders building.

Degutis testified that Dietrich "was not at the time we started the interview process[,] in my mind[,] qualified" for the Clinics Fulfillment position. At the time of the interviews for the job of Manager of Clinics Fulfillment, Dietrich was a Supervisor of Systems Analysis in the Clinics Fulfillment Department. Within the Saunders hierarchy, "Supervisors" are below "Managers." Dietrich's particular job was classified as a "level 3" position. Dietrich had been with Saunders three years, and had worked on the computerization of the Clinics Fulfillment Department. At the time of her interview, Dietrich was earning an annual salary of $19,773.

Dietrich's previous work experience—beginning several years before she began working at Saunders—had been as Assistant Manager and then Manager of the Arena Stage, a theater in Washington, D.C. In that position she was responsible for a staff of 15 to 20 people. She was paid on an hourly basis. Her more recent work experience prior to joining Saunders had been as a sales clerk at Bamberger's Department Store and as a front office manager at a grocery store.

Two months before formally filling the position, Degutis made Dietrich temporary head of the Clinics Fulfillment Department. While Dietrich was at the time the senior of the three Supervisors in the Department, Bruno testified that Degutis told her that Dietrich had been given this job because "I know how everybody felt about Beverly so I wanted to give her a chance to prove herself." Degutis testified that this interim appointment was not intended to be a testing period for Dietrich.

Ultimately, Degutis chose Dietrich to fill the post permanently. Although the job had been posted as a "level 8" position, it was given initially to Dietrich as a "level 7." Dietrich was raised from a level 3 to a level 8 in two steps primarily because Saunders management felt that her salary increase would otherwise have been too great for one person to receive at one time. Six months after her installment as Manager of Clinics Fulfillment, Dietrich's annual salary was $29,000. Following Dietrich's selection, Bruno filed an Equal Employment Opportunity Commission (EEOC) charge alleging discrimination on the basis of age.

Several months after she was passed over for the Clinics Fulfillment position, and while she was still working at Saunders, Bruno was offered a job as Manager of Inventory Planning and Control in the Bellmawr, New Jersey warehouse facility Saunders shared with other CEPP subsidiaries. Bruno first accepted the job, but changed her mind four weeks later, before the job commenced. Bruno testified that she was told by a CEPP executive that a condition of her employment in that position was that she not proceed with her age discrimination claim.

Bruno was laid off by Saunders in May 1986. After her termination, Bruno continued to receive pay for four months. Seven months after her severance pay ended, Bruno accepted a job at the Provident National Bank for an annual salary of $18,000 plus benefits.

Bruno brought this action in the district court under the ADEA.[1] After trial, the jury found the defendants liable for "willful" age discrimination in their failure to give Bruno the Manager of Clinics Fulfillment job, and awarded liquidated damages as provided for by the statute. *See* 29 U.S.C. § 626(b). The jury verdict in favor of Bruno included $150,000 denominated "lost wages and benefits" and $700,000 denominated "front pay." The parties agree that half of each of these amounts represents liquidated damages.

On appeal, the defendants present a litany of alleged errors.

## II.

The defendants' first challenge to the judgment in the district court is that the

---

1. Bruno's complaint also included allegations of sex discrimination in violation of title VII, 42 U.S.C. § 2000e, *et seq.*, discrimination in violation of state law, and breach of contract. Bruno no longer presses these claims.

evidence was insufficient to support the verdict. To win on such a challenge, the defendants must show that the record "is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Simone v. Golden Nugget Hotel*, 844 F.2d 1031, 1033 (3d Cir.1988) (citation omitted).

Under the now familiar analytical framework that has been established for analyzing ADEA claims, the plaintiff first bears the burden of establishing a *prima facie* case. *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). If the plaintiff meets this burden, it raises an inference of unlawful discrimination. The burden of production then shifts to the defendant, who can dispel the inference of discrimination by articulating a "legitimate, non-discriminatory reason" for its employment action. *McDonnell–Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. If the defendant succeeds in this, the burden then returns to the plaintiff, who retains the ultimate burden of persuasion. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. To win his case, the plaintiff must "prove by a preponderance of the evidence that the proffered reasons were not the employer's true reasons." *Sorba v. Pennsylvania Drilling Company*, 821 F.2d 200, 202 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988).

Saunders and CEPP argue that the evidence was insufficient to support the verdict because it was not adequate to raise an inference of age discrimination at the *prima facie* case stage. They also argue that the evidence is insufficient to support a jury finding that their articulated, non-discriminatory reason for the employment decision in this case is mere pretext.

## A.

■ The defendants first challenge the sufficiency of the evidence to raise an inference of age discrimination at the *prima facie* case stage. Of course, after a case has been tried to a jury on the merits, "it is unnecessary for the appellate court to decide whether a *prima facie* case had, in fact, been established." *Blum v. Witco*, 829 F.2d 367, 372 n. 2 (3d Cir.1987). "Where the defendant has done everything that would be required of him if the plaintiff had made out a prima facie case, whether the plaintiff really did so is no longer relevant." *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). Rather, the appellate court must consider the ultimate issue: whether the plaintiff proved by a preponderance of the evidence that age was a determinative factor in the employer's hiring decision. *Blum*, 829 F.2d at 372 n. 2. "The issue of whether plaintiff established a *prima facie* case is subsumed on appeal into whether the plaintiff has sustained his or her ultimate burden," *Dreyer v. Arco Chem. Co.*, 801 F.2d 651, 654 (3d Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987).

We will therefore treat the defendants' first contention as an argument that the evidence is insufficient to support the verdict. The defendants' contention in essence is that the evidence of a ten-year difference in age between Bruno, who was 46 at the time she applied for the Clinics Fulfillment job, and Dietrich, who was then 36, is insufficient to support an inference of age discrimination essential to plaintiff's case. Put another way, the defendants argue that the evidence could not support an ultimate conclusion that their employment action was discriminatory because it is insufficient to allow any inference that Bruno's age was a determining factor.[2]

---

**2.** Although we do not address this contention in terms of the *prima facie* case, it may be that our inquiry into the sufficiency of the evidence to support such an inference will not differ markedly from an inquiry into whether the plaintiff has introduced evidence sufficient to establish

one of the elements essential to her *prima facie* case. Cf., *Gunby v. Pennsylvania Elec. Co.*, 840 F.2d 1108, 1115 n. 10 (3d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989).

We disagree. Congress has defined the protected class to include only those people between forty and seventy years of age. 29 U.S.C. § 631(a). Where the plaintiff is a member of the protected class and the successful candidate is not, the precise difference in age between the plaintiff and the successful candidate is not decisive, at least in a case such as this where the difference is not so small as to make an inference of discrimination absurd.

Contrary to the defendants' suggestion, this conclusion is not inconsistent with *Maxfield v. Sinclair International*, 766 F.2d 788 (3d Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). In *Maxfield* we held that the difference in age between a 65–year old and a 42–year old was "sufficient" to make out one of the elements of a *prima facie* case necessary to raise an inference of age discrimination at that stage of the litigation. *Maxfield*, however, presented a situation where the plaintiff and the successful job applicant were both *within* the protected class. In that context we found it necessary to examine the magnitude of the age difference in order to determine whether it would support an inference of discrimination.

This case presents the more common type of discrimination case where the plaintiff is within the protected class and the person ultimately chosen for the job is not. In title VII cases of race or sex discrimination, from which our method of analyzing age discrimination claims has been transplanted, this would be enough to support an inference of discrimination. *See, e.g., Jackson v. University of Pittsburgh*, 826 F.2d 230, 233 (3d Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 732, 98 L.Ed.2d 680 (1988) (title VII race discrimination case) (where plaintiff is within protected class, one element of *prima facie* case made out simply by showing that persons treated more favorably were not within the protected class). So it is in actions under the ADEA. *Maxfield* did not disturb the settled rule that more favorable treatment for those not within the protected class will support an inference of age discrimination. *See, e.g., Massarsky v. General Motors,*

706 F.2d 111, 118 (3d Cir.), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983) (to make out *prima facie* case, plaintiff "need only show that he is a member of the protected class and that he was laid off from a job for which he was qualified while others not in the protected class were treated more favorably"). We conclude therefore that the evidence here was sufficient to support an inference of age discrimination.

### B.

"[O]nce the defendant has produced admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus ... plaintiff's ultimate burden of persuasion includes the requirement to show that the defendant's proffered reason is a pretext for discrimination." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 898 (3d Cir.) (in banc), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In their second, more narrow, challenge to the sufficiency of the evidence to support the verdict, the defendants argue that even if the evidence of the difference in age between Bruno and Dietrich was sufficient to support an inference of discrimination, there was insufficient evidence to support a conclusion that the defendants' proffered reason was a pretext.

The defendants here did articulate a legitimate, non-discriminatory motive for failing to hire Bruno for the Clinics Fulfillment job. The defendants state that Bruno was not selected because it was Degutis's perception that her interest in the job was half-hearted. They also contend that Dietrich was selected over Bruno based on her performance as acting head of the Clinics Fulfillment Department during the two months that preceded her actual hire to fill the Manager of Clinics Fulfillment position. Before the district court, Degutis testified additionally that among the reasons he selected Dietrich were her "enthusiasm" and the fact that she was the "most qualified" candidate. The defendants do not rely on these explanations in this appeal.

There is a variety of evidence that tends to rebut the defendants' articulated reasons for their employment action. As to Bruno's interest in the job, Bruno testified that she spoke to Degutis often about the job during the time between her interview and the time the position was ultimately filled, and that, indeed, at one point he said to her "Addie, quit pushing." Both Degutis himself and Richard Bates, then CEPP's Vice–President for Fulfillment Services, testified that, subsequent to Bruno's interview with Degutis, Bates told Degutis that Bruno wanted the job. Degutis also testified that Bruno mentioned the job to him—albeit offhandedly—more than once during the period when he was selecting among the candidates for the position.

As to Dietrich's performance during the interim period when she was acting head of Clinics Fulfillment, there was testimony in the district court by others employed by Saunders during that time—the Director of Management Information Systems, and the Manager of Computer Operations—that Dietrich did not show ability, at least in some aspects of the job. The evidence in its totality meets the minimum threshold necessary to support a conclusion that the defendants' proffered reasons were a pretext.

The law is clear that a plaintiff can win an age discrimination action without *direct* evidence specifically relating to age by proving that the reason for the unfavorable treatment put forward by the employer is a pretext. *Chipollini*, 814 F.2d at 898. The message of *Chipollini* is *not*, however, that anyone who suffers an adverse employment decision can win a discrimination suit. The message is that Justice Rehnquist's words for the Supreme Court will be taken seriously: "when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's action, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). This framework places a premium on truthfulness by the defen-

dant. If a "legitimate, non-discriminatory" reason articulated by a defendant faced with a *prima facie* case of discrimination is not the *true reason* for a failure to hire, the court may infer that the actual reason was impermissible.

### III.

The defendants next argue that the district court erred in the admission of evidence and they ask for a new trial. In this Circuit, review of rulings on relevance is plenary. *See Brobst v. Columbus Services*, 824 F.2d 271, 274 (3d Cir.1987), *cert. denied*, ⸺ U.S. ⸺, 108 S.Ct. 777, 98 L.Ed.2d 863 (1988). Other evidentiary questions are reviewed for abuse of discretion.

### A.

■ The defendants challenge the statistical evidence Bruno presented. In particular, they attack studies done by plaintiff's expert that compare whether Saunders employees over forty years of age received transfers or promotions in proportion to the percentage of all Saunders employees over forty. The defendants argue that these studies are irrelevant because they did not account for the minimum objective qualifications of the jobs into which transfer or promotion was possible. The Supreme Court has held that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400, 106 S.Ct. 3000, 3008, 92 L.Ed.2d 315 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part). It has also noted that "[t]here may, of course, be some regressions so incomplete as to be inadmissible as irrelevant." *Id.* at 400 n. 10, 106 S.Ct. at 3009 n. 10.

Unlike the main cases cited by the defendants, this is not a class action disparate impact or disparate treatment case. *See Segar v. Smith*, 738 F.2d 1249 (D.C.Cir. 1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985) (disparate impact); *Valentino v. United States Postal Service*, 674 F.2d 56 (D.C.Cir.1982) (dispar-

ate treatment). In such cases, statistical evidence that does not account for minimum objective qualifications may not "measure disparities among comparably qualified workers, rather than disparities in qualifications." *Segar,* 738 F.2d at 1274. Of course, even in such cases, the requirement that statistical evidence account for minimum qualifications is not a "hard and fast rule." *Id.* Still, as a general matter, in class actions—"where liability depends on a challenge to systemic employment practices[,] courts have required finely tuned statistical evidence." *Krodel v. Young,* 748 F.2d 701, 709 (D.C.Cir.1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985).

By contrast, in individual disparate treatment cases such as this, statistical evidence, which "may be helpful, though ordinarily not dispositive," *id.* at 710, need not be so finely tuned. In individual disparate treatment cases such as this, a general rule requiring that all statistical evidence account for minimum objective qualifications would not be broadly useful. Rather, "the usefulness of statistics will depend primarily upon their relevance to the specific decision affecting the individual plaintiff." B. Schlei and P. Grossman, *Employment Discrimination Law* 1316 (2d ed. 1983). *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 1856–57, 52 L.Ed.2d 396 (1977) (the usefulness of statistics "depends on all the surrounding facts and circumstances").

The statistical evidence in this case is being used to bolster the plaintiff's case that the defendants' articulated reason for an individual employment decision is a pretext. Even though it does not account for the minimum objective qualifications of the positions into which transfer or promotion was possible, we conclude that the studies are "relevant." That is, as evidence they meet the requirement of Federal Rule of Evidence 401 that they "make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. *Compare McDonnell–Douglas,* 411 U.S. at 804–05, 93 S.Ct. at 1825 (defendant's policy and practice with respect to employment of protected class relevant to showing of pretext).[3]

The studies are significantly less probative than they would be if they took account of the minimum qualifications of the jobs into which promotion or transfer occurred. However, the district court's conclusion that they are more probative than prejudicial was within the limits of the permissible exercise of that court's sound discretion.

### B.

■ The defendants also challenge the plaintiff's statistical studies because they compare new hires to the age of existing employees—without taking account of the correlation between age and normal corporate advancement—and because along with "individual termination decisions" they consider terminations resulting from Saunders' decision to close its printing plant. The plaintiff contends that these objections were waived because they were not specifically made in the district court. While the defendants did not object to this evidence at the time of introduction, they did challenge it in their motion *in limine.*

While normally an objection to the admission of evidence must be raised at trial to be preserved, this court will sometimes permit evidentiary question to be preserved by a motion *in limine. See American Home Assurance Co. v. Sunshine Supermarket,* 753 F.2d 321 (3d Cir.1985). A determination that the objections were preserved by a motion *in limine* requires an evaluation of the extent of the briefing on the motion *in limine,* and the definitiveness of the district court's ruling on the motion. The pretrial motion will suffice only if we con-

**3.** This conclusion also disposes of the defendants' contention that there is no admissible evidence to support the district court's instruction to the jury that Bruno could establish age discrimination "by showing that defendants engaged in a pattern or practice of discrimination against their employees or prospective employees." The defendants do not argue that this jury instruction contains a misstatement of the applicable law.

clude that requiring an objection at trial "would have been in the nature of a formal exception." *Id.* at 324–25.

In this case, the defendants' brief in support of its motion *in limine* specifically raised the evidentiary issues the defendants now wish to present before this court. However, the defendants have not pointed to any place in the record where their motion was ruled on by the district court. Without a definitive ruling against the defendants, there could be no reliance factor in this case. Consequently, the defendants, in failing to object to these studies at trial, have failed to preserve this issue for appellate review.

### C.

■ The defendants also challenge the admission of evidence that Degutis and Dietrich, the woman he finally chose for the Clinics Fulfillment position, were seen together frequently. They argue that no reasonable inference of age discrimination can be drawn from this evidence. After an examination of the record, we conclude that, even if this evidence was not admissible, there was no reversible error.[4]

### IV.

### A.

■ The defendants also seek a new trial on the basis of alleged error in the district court's instruction to the jury that "[w]here economic savings are directly related to an employee's age, however, it is a violation of the [ADEA] not to hire an older employee for those reasons.... [I]f you believe that the economic savings to the company were an age related factor which induced the defendants to hire Beverly Dietrich for economic reasons rather than an older employee such as Adeline Bruno, then Adeline Bruno is still entitled to prevail on her claim."

In the district court, at the end of the jury charge, the defendants challenged this instruction only on the ground that there was insufficient evidence to support it. The defendants renew this contention before this court.[5]

We find the defendants' challenge without merit. While there may not be any evidence that there was a correlation between age and salary across the board at Saunders, there certainly was evidence that there was a financial saving involved in hiring the younger Dietrich over the older Bruno. In addition, there was testimony of another employee who was not chosen for the Clinics Fulfillment job, Ann Marie Martino, that CBS (of which CEPP is a division) was trying to reduce its number of longer-term employees in order to reduce its costs. Because the defendants' contention is without merit, the district court's refusal to grant a new trial on this ground was not an abuse of discretion.

### B.

■ We also find without merit the defendants' contention that a new trial is required because the district judge instructed the jury on the circumstantial order of proof developed in the *McDonnell–Douglas* line of cases. Even assuming that submission to the jury of the question whether the plaintiff made out a *prima facie* case is error, we do not believe the instructions here could have confused and misled the jury such that the defendants would be prejudiced. At worst, the jury instructions—which, taken as a whole, fairly and adequately described the shifting burdens of production and persuasion—presented the plaintiff with an additional obstacle, the possibility that the jury would find for the defendants on the basis that the plaintiff failed to make out a *prima facie* case. Therefore there again was no abuse of discretion when the district court

---

**4.** Neither was there any reversible error in the district court's decision to exclude evidence of Dietrich's post-selection performance on the ground that it is irrelevant to Dietrich's qualifications to be selected for the Clinics Fulfillment position.

**5.** A second objection that the defendants urge before this court—that the instructions did not accurately state the substantive law—was not presented in the district court.

declined to grant a new trial on this ground.

## C.

The defendants' most confusing allegation involves a so-called missing witness, CEPP executive William Wright. Bruno testified at trial that Wright told her "off the record" that if he had been her, he would have pursued an age discrimination claim. She testified that he also told her "if you ever repeat that, I'll deny it." While defendants' counsel said in his opening statement that he would call Wright to testify, Wright was not called. Although there was no evidence concerning Wright's availability, the district judge gave the jury a standard "missing witness" instruction charging them to decide whether Wright was reasonably available only to the defendant or equally available to both parties in ascertaining whether to draw an adverse inference from the defendants' failure to call him.

█ While the jury deliberated, the judge—at the suggestion of defendants' counsel—took the highly unusual step of taking Wright's testimony by telephone from New York. The purpose of this call was apparently to get testimony concerning Wright's availability. Wright testified that Bruno saw him and spoke to him during one morning of the trial when he was in the courtroom. Wright also testified—in response to a question from the judge—that he had not made the statement attributed to him by Bruno. The judge granted the defendants' motion to admit this testimony. However, by this time, the jury had reached a verdict for Bruno.

Nonetheless, the district judge permitted the jury to hear the testimony of Bruno and her counsel that neither one of them had knowledge that Wright was in the courtroom during the trial. The judge then had a tape recording of Wright's telephone testimony played to the jury. The judge permitted an additional summation by each side, then sent the jury back to deliberate further with an interrogatory asking whether this evidence would cause them to change their verdict. Eight minutes later, the jury returned with the answer "No."

The defendants challenge the propriety of giving a missing witness instruction, and argue that the instruction given by the district judge was in error. The plaintiff contends that there was evidence sufficient to permit a conclusion that Wright was peculiarly within the defendants' power to produce. She also argues that any error was cured by the post-verdict proceedings in the district court which presented evidence to the jury on the question of Wright's availability to the parties.

The parties miss the significance of the introduction of Wright's testimony. Wright testified not merely on his *availability,* but on the issue on which the inference adverse to the defendant was permitted to be drawn. Thus, the judge's post-verdict interrogatory to the jury did not merely ask them to reconsider Wright's availability to the parties, it asked them to reconsider their verdict in light of Wright's testimony *favorable to the defendants* that he had not told Bruno that she was right to pursue her age discrimination charge. Thus, the "missing witness" is no longer missing and any taint that might have been caused by the allegedly improper charge was cured by his testimony and the district judge's post-verdict interrogatory.[6]

## V.

█ The defendants next argue that there was insufficient evidence to permit the jury to find that Bruno satisfied her duty to minimize her damages. They. assert that Bruno's rejection of the job she was eventually offered as Manager, Inventory Planning and Control at the Bellmawr, New Jersey warehouse facility constituted a rejection of an unconditional offer of a

6. ˙ This also disposes of the defendants' contention that the district judge erred in permitting plaintiff's counsel to make a "missing witness" argument in his closing argument to the jury. The defendants' contention that there is clear and convincing evidence that the plaintiff and her counsel procured the judgment through fraud by denying Wright was available to them is also without merit.

"substantially equivalent" job. The defendants contend that this forfeits her right to monetary relief for any period subsequent to that rejection.

In *Ford Motor Co. v. EEOC*, 458 U.S. 219, 232, 102 S.Ct. 3057, 3066, 73 L.Ed.2d 721 (1982), the Supreme Court held that an employment discrimination plaintiff's duty to minimize his damages includes a requirement that he accept a "substantially equivalent" job offered by the defendant. If the plaintiff fails to accept such a job, the accrual of back pay liability by the defendant employer will be tolled. The Supreme Court, however, also recognized in *Ford Motor Co.* that the plaintiff's obligation in this regard was not absolute. "The claimant's obligation to minimize damages in order to retain his right to compensation does not require him to settle his claim against the employer, in whole or in part. Thus an applicant or discharged employee is not required to accept a job offered by the employer on the condition that his claims against the employer be compromised." *Ford Motor Co.*, 458 U.S. at 232 n. 18, 102 S.Ct. at 3066 n. 18.

The jury here found by special interrogatory that the job Bruno was eventually offered as Manager, Inventory Planning and Control at the Bellmawr, New Jersey warehouse facility was "superior or substantially equivalent" to the Clinics Fulfillment position that Bruno was denied. A second interrogatory asked whether "the plaintiff act[ed] as a reasonable person under the circumstances would have acted when she rejected the offer of the Bellmawr job." We understand this interrogatory to address the question whether the offer of the Bellmawr job was conditioned on Bruno dropping her age discrimination claim.[7] The jury answered in the affirmative.[8] The defendants now argue that the evidence was insufficient to support the jury's conclusion.

Even assuming this contention was not waived, an examination of the record reveals that the defendants' position is without merit. Bruno testified that Richard Bates, then Vice–President of Fulfillment Services at CEPP in New York, told her "that it would be expected of me to drop my [EEOC] claim if I accepted [the Bellmawr job] ... and I took that to mean that—that you better do it or they're gonna find a way to get rid of you." She also testified that this conversation made her feel that "They're gonna get you over in a job that you can't do and they're gonna find an excuse to get rid of you."

Bruno testified that she felt her fear was supported by her discussion with Bates: "I even said to Rick, 'Suppose I try it. Will you put in writing that if it doesn't work out and I can still be let go and have my same severance that I would have had in February?' And he said, 'Well, I don't think we can do that.' And then I thought right then and there: Well ... they really are not offering this to me as a way to help me; they're just trying to help themselves. They want me to drop my claim."

This evidence is sufficient to permit the jury's award notwithstanding the substantial equivalence of the Bellmawr job with the Clinics Fulfillment position for which Bruno originally applied.

The defendants rely on the fact that Bates's superior, William Wright, subsequently wrote Bruno a note, at a time when she could still have taken the job, saying "[t]he Bellmawr job offer is not, and never was, conditional on dropping your claim. If it was, the condition would necessarily have been stated in writing ... I do not understand how your perception of this matter evolved."

The defendants argue that this memo renders irrational any inference that the Bellmawr job was conditioned on Bruno dropping her EEOC charge. This evidence, however, merely presents a question of credibility. Notwithstanding the memo, the record contains sufficient evidence to

---

7. The defendants did not challenge this interrogatory in the district court on the basis that it contained a misstatement of the applicable law.

8. Under our understanding, the jury's answers to these two interrogatories are not, as defendants suggest, "inconsistent."

support the jury's conclusion.[9]

The defendants also point out that Bruno testified in a deposition that after receiving Wright's memo, "I understood that I could accept the job and still pursue the claim if I wanted to." In context, the jury was entitled to read this simply as a statement of Bruno's belief that any such condition was contrary to law. Bruno's testimony does not alter the fact that there is sufficient evidence to support a conclusion by the jury that the Bellmawr job was conditioned on Bruno's claim being compromised.

## VI.

The defendants finally challenge the district court's award of liquidated damages. The ADEA provides that "liquidated damages shall be payable only in cases of willful violations." 29 U.S.C. § 626(b). A finding of willfulness in an individual disparate treatment case requires not merely that the employer knew or should have known that its conduct violated the ADEA, but "some additional evidence of outrageous conduct." *Dreyer v. Arco Chem. Co.*, 801 F.2d at 658. "The Restatement suggests that in assessing punitive damages, the trier of fact can properly consider *inter alia* the character of the defendant's act, and the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause." *Id.* (quoting Restatement (Second) of Torts § 908(2)) (brackets and internal quotation marks omitted). "[T]he appropriateness of the award [of liquidated damages is] dependent upon an ad hoc inquiry into the particular circumstances." *Id.* The jury in the present case awarded Bruno $150,000 in back pay, of which the parties agree $75,000 represents liquidated damages and $700,000 in front pay of which the parties agree $350,000 represents liquidated damages.[10]

### A.

▆ To begin with, the defendants argue that the evidence is not sufficient to support a finding of willfulness. We disagree. Again assuming this objection was not waived, after examining the record we conclude that there is sufficient evidence of willfulness to support an award of liquidated damages.

As to the character of the defendants' action, both Bruno and Ann Marie Martino, another applicant who was not chosen for the Clinics Fulfillment post, testified that a job description prepared for the opening in that position was unusual in that it did not include a requirement of "management experience." A jury could infer that the job description was intended to provide a justification for the selection of Dietrich over Bruno. We also observe that the evidence surrounding the offer to Bruno of the Bellmawr job could support a conclusion that the position was offered her in bad faith.

Additionally, there is evidence that the discriminatory action here was taken against an employee who was being laid off after eleven years of service, in favor of an employee whose then-current job at Saunders was not being eliminated. It is also relevant that there is evidence that during her tenure at Saunders, Bruno received the CBS Employee Achievement Award and an "outstanding employee" award from Saunders for demonstrating "commitment and excellence beyond the normal requirements of [her] position."

As to the extent of the harm caused to Bruno, there is evidence that she was unable to find another job for eleven months, and that she eventually had to accept an enormous reduction in salary. Taken together, the evidence—though concededly not all of equal weight on the issue—is sufficient to support the finding of "outrageousness" required to award liquidated damages.

### B.

▆ The defendants next argue that even if the evidence supports an award of

---

**9.** The defendants make no suggestion that Wright's memo gave rise to any new duty on Bruno's part.

**10.** We conclude that, taken as a whole, the district court's instructions fairly and adequately presented to the jury the standard for finding a "willful" violation of the statute.

liquidated damages, such damages are not permissible on front pay. Liquidated damages are defined in the Fair Labor Standards Act, 29 U.S.C. § 216(b), incorporated by reference in the ADEA, 29 U.S.C. § 626(b), as an amount equal to "minimum unpaid wages or ... unpaid overtime compensation." The defendants argue that front pay is an equitable substitution for an order of reinstatement, and not an award of lost future wages. The plaintiff argues that the deterrent purpose of liquidated damages will be served identically whether the award is for "front pay" or "back pay," and that the division of lost wages into past and future components is largely a matter of fortuity, depending upon how long it takes for the case to get to trial.

This dispute was settled in this Circuit by *Blum v. Witco*, 829 F.2d at 382–83. While *Blum* by its terms applies only to front pension benefits, its implication is unmistakable: "A front pay (or, in this case, front benefits) award is the monetary equivalent of the equitable remedy of reinstatement. Given its tenor, we decline to extend the liquidated damages provision of the ADEA to double this equitable award." *Id.* at 383 (citations omitted). The district court's award will be reduced by the amount that represents liquidated damages for front pay.[11]

## VII.

The judgment of the district court will be affirmed after a reduction of $350,000. Seventy-five percent of the costs will be allocated against appellants, and twenty-five percent against appellee.

**11.** The defendants' challenges to the amount of front pay awarded are without merit. Assuming without deciding that the defendants preserved their objection to the jury instructions on front pay, we conclude that the instructions taken as a whole fairly presented the issue to the jury, including the question of the duration of the period for which front pay should be awarded.

The determination of the *amount* of front pay necessarily involves some imprecision. However, to permit the jury to undertake that calculation is not reversible error and we decline to

GREENBERG, Circuit Judge, dissenting.

I respectfully dissent. Bruno's three statistical studies of transfers and promotions, new hires, and terminations had no probative value because they failed to take into consideration the "minimum objective qualifications" necessary for the positions at issue. The Supreme Court has concluded that statistical analyses offered into evidence in employment discrimination cases which do not take into consideration the special qualifications which may be necessary for the positions at issue are fundamentally flawed.

In *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), a Title VII case in which the government alleged racial discrimination in the hiring of teachers, "the Court of Appeals rejected the trial court's analysis of the statistical data as resting on an irrelevant comparison of Negro teachers to Negro pupils," and "directed judgment for the Government." *Id.* at 304–06, 97 S.Ct. at 2740–41. While it vacated the judgment of the court of appeals,[1] the Supreme Court observed that

the District Court's comparison of Hazelwood's teacher work force to its student population fundamentally misconceived the role of statistics in employment discrimination cases. The Court of Appeals was correct in the view that a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market.

*Id.* at 308, 97 S.Ct. at 2741–42.

Although recognizing that work-force/general population comparative statistics may

order a new trial simply because the amount is not the same as that offered by Bruno's expert.

**1.** The Court held that

the Court of Appeals erred in disregarding the post-Act hiring statistics in the record, and that it should have remanded the case to the District Court for further findings as to the relevant labor market area and for an ultimate determination of whether Hazelwood engaged in a pattern or practice of employment discrimination after May 24, 1972.

433 U.S. at 313, 97 S.Ct. at 2744.

be "highly probative ... [when] the job skill involved ... [—such as] the ability to drive a truck—is one that many persons possess or can fairly readily acquire," *id.* at 308 n. 13, 97 S.Ct. at 2742 n. 13 (discussing *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 339–340 & n. 20, 97 S.Ct. 1843, 1856 & n. 20, 52 L.Ed.2d 396 (1977)), the Court stated that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13.[2]

The Supreme Court in *Hazelwood* referred to *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), as an example of a case "in which the racial-composition comparisons failed to take into account special qualifications for the position in question." 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13 (citing *Educational Equality League*, 415 U.S. at 620–21, 94 S.Ct. at 1333–34). In *Educational Equality League*, the plaintiffs alleged that the mayor of Philadelphia had violated the Equal Protection Clause of the Fourteenth Amendment by discriminating against blacks in making appointments to the city's panel charged with submitting nominees to him to fill vacancies on the city's school board. The Supreme Court reversed the finding of racial discrimination by the court of appeals because it was based, in part, on "racial-composition percentage comparisons [of the panel's racial composition to that of Philadelphia's population] that we think were correctly rejected by the District Court as meaningless." The Court stated that "this type of proof is too fragmentary and speculative to support a serious charge in a judicial proceeding." 415 U.S. at 621, 94 S.Ct. at 1333.[3]

In another Supreme Court Title VII case, *Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986), the plaintiffs had attempted to introduce into evidence statistical studies based on multiple regression analyses designed to show that employee salary levels were affected by the employer's racial discrimination. The district court held that, although the regressions used four variable factors, consisting of race, education, tenure, and job title, the failure to use other factors, including pay increases which varied by county, precluded their introduction into evidence. *See id.* at 398–99, 106 S.Ct. at 3008.

The district court's decision to exclude this evidence was upheld by the court of appeals. However, the Supreme Court held that

[t]he Court of Appeals erred in stating that petitioners' regression analyses were 'unacceptable as evidence of discrimination,' because they did not include 'all measurable variables thought to have an effect on salary level.' The court's view of the evidentiary value of the regression analyses was plainly incorrect. While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the *major factors* 'must be considered unacceptable as evidence of discrimination.' Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.

**2.** In two recently decided Title VII cases, the Supreme Court has reaffirmed the *Hazelwood* requirement that statistical studies purporting to provide evidence bearing on employment discrimination take into account the qualifications required for the positions at issue. *See Wards Cove Packing Co. v. Atonio*, — U.S. —, 109 S.Ct. 2115, 2121–22, 104 L.Ed.2d 733 (1989); *Watson v. Fort Worth Bank and Trust*, 487 U.S. —, —, 108 S.Ct. 2777, 2790, 101 L.Ed.2d 827 (1988).

**3.** The Court observed that "assuming, *arguendo*, that percentage comparisons are meaningful in a case involving discretionary appointments, the relevant universe for comparison purposes consists of the highest ranking officers of the categories of organizations and institutions specified in the city charter, not the population at large." 415 U.S. at 620–21, 94 S.Ct. at 1333.

*Id.* at 400, 106 S.Ct. at 3009 (emphasis added) (citation omitted).

It is significant that the Court added in a footnote that "[t]here may, of course, be some regressions so incomplete as to be inadmissible as irrelevant; but such was clearly not the case here." *Id.* at 400 n. 10, 106 S.Ct. at 3009 n. 10.

In *Bazemore,* the Supreme Court addressed a statistical study which, although not including "all measurable variables," included all "major factors." *Id.* at 400, 106 S.Ct. at 3009. The statistical studies submitted by Bruno, however, were apparently not controlled for any factor other than age.[4] Furthermore, the plaintiffs in *Bazemore* had "presented evidence to rebut [defendants'] contention that county to county variations in contributions to salary explain the established disparity between black and white salaries." *Id.* at 402, 106 S.Ct. at 3010. In this case, Bruno did not produce evidence to refute the defendants' assertion that her statistical studies would show no disparities based on age if they had taken into consideration the minimum objective qualifications of the positions at issue.

Relying on *Hazelwood,* the United States Court of Appeals for the District of Columbia Circuit, in a Title VII case, noted that

[t]he most common nondiscriminatory explanation for a systemic disparity in treatment is a lack of qualifications among the minority group members. A plaintiff's statistical evidence must therefore focus on eliminating this nondiscriminatory explanation by showing dispari-ties in treatment between individuals with comparable qualifications for the positions at issue.

... [B]oth the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.

... To ensure that a plaintiff's methodology has eliminated the common nondiscriminatory explanation of a lack of qualifications, this circuit has developed a requirement that statistical evidence of disparities account for the *minimum objective qualifications* for the positions at issue.

*Segar v. Smith,* 738 F.2d 1249, 1274 (D.C. Cir.1984) (citing *Hazelwood,* 433 U.S. at 308 n. 13, 97 S.Ct. at 2742 n. 13) (citation omitted),[5] *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); *see Simpson v. Midland–Ross Corp.,* 823 F.2d 937, 943–44 (6th Cir.1987) (ADEA); *Palmer v. Shultz,* 815 F.2d 84, 91 & n. 6 (D.C.Cir. 1987) (Title VII); *Valentino v. United States Postal Serv.,* 674 F.2d 56, 69 (D.C. Cir.1982) (same); *Grano v. Department of Dev.,* 637 F.2d 1073, 1078–79 (6th Cir.1980) (same).[6]

In its charge to the jury in this case, the district court, after discussing expert witnesses in general, referred to statistical evidence and stated that

in order for a statistical analyses [*sic*] of an employer's personnel decisions to reveal an apparent age bias not produced by chance or other nondiscriminatory factors in those personnel decisions, the analyses must utilize accepted methods

---

**4.** Bruno does not contend, nor could she in the face of her expert witness's trial testimony to the contrary, that the statistical studies were controlled for specific job qualifications. *See* app. at 603–623.

**5.** In *Anderson v. Group Hospitalization, Inc.,* 820 F.2d 465 (D.C.Cir.1987), a Title VII case where the employer's promotion practices were at issue, the court observed that, although in the usual case "no inference of unlawful racial animus can be drawn from a statistical comparison that fails to account for relevant job qualifications," taking into account such qualifications was unnecessary where the employer had established "no objective critera governing promotions." *Id.* at 469, 470; *see Davis v. Califano,*

613 F.2d 957, 964–65 (D.C.Cir.1979). However, here there is ample evidence, including Bruno's testimony and documentary evidence concerning defendants' personnel policy, including job posting, *see, e.g.,* app. at 880, 895, 897, 900–900h, showing that at least some of the positions which were the subject of the statistical studies required particular qualifications.

**6.** The standard for relevancy should be the same whether the statistical evidence is offered to rebut the employer's evidence that the employment decision was non-discriminatory and thus legitimate, as it apparently was in this ADEA case, or as part of the employee's attempt to establish *prima facie* employer discrimination, typically in Title VII disparate impact cases.

and formulas and must account for the minimum objective qualifications for the positions filled by those personnel decisions.

Statistical analyses which apparently reveal an age bias in personnel decision making but which do not control for the minimum objective qualifications necessary for the positions studied are for all intents and purposes meaningless.

So you should scrutinize closely the statistics, the basis for them and recall the various apples and oranges, apples and apples arguments in looking at the statistics to see that they are of some assistance to you in reaching a proper result in this case.

App. at 379–80.

The difficulty with this charge, though a correct statement of the law, is that it required the jury to determine whether the statistical evidence was "meaningless," *i.e.*, irrelevant, since devoid of probative value under Fed.R.Evid. 401 and 402. Although the district court properly charged the jury that in considering the value of the experts' testimony it should take into account the facts on which their opinions were based and whether "their facts are in fact facts," app. at 378, the court should have excluded the statistical evidence itself.[7] While a jury makes factual determinations, it surely does not undertake to make the legal determination of whether an analysis controls for "minimum objective qualifications." What happened here is clear. Prejudicial irrelevant evidence was admitted which the jury was told to disregard if it made findings of law going not simply to weight but to admissibility. Here the only charge to the jury regarding the statistical evidence that would have been correct would have been an instruction to disregard it. The district court in this case wrongfully relinquished its function as the judge of the law, which includes the obligation to pass on the admissibility of evidence, to the jury. The threshold question of the admissibility of statistical evidence is simply not subject to conditional admissibility under Fed.R.Evid. 104(b).

I agree with the majority's observation that while this is an individual disparate treatment case, it has been in class action disparate impact or disparate treatment cases in which the law regarding statistical evidence has largely developed. Majority op. at 766–67. The majority further points out that in an individual disparate treatment case statistical evidence, though helpful, will ordinarily not be dispositive, and with this I also agree, as in an individual treatment case the evidence will focus on the particular plaintiff rather than an overall class.

However, I part company with the majority's conclusion that statistical evidence, irrelevant because inherently unreliable, can, somehow, in a different context, be relevant. The point is that the statistical evidence, whether introduced in a class action disparate treatment or impact case or an individual disparate treatment case, has the same purpose: to support the position of a party in a case involving a claim of discrimination. Thus, here the district court instructed the jury in its charge that Bruno's statistical evidence was offered in support of her case. At most, the distinction between class actions and individual disparate treatment cases could be the basis for a harmless error analysis when flawed statistical evidence is admitted, but on the record here the evidence was not harmless and the majority does not undertake a harmless error analysis. Rather, it writes:

> The statistical evidence in this case is being used to bolster the plaintiff's case that the defendants' articulated reason for an individual employment decision is a pretext. Even though it does not account for the minimum objective qualifications of the positions into which transfer or promotion was possible, we conclude that the studies are 'relevant.'

Majority op. at 767.

Liability in this case was sharply disputed, and the outcome clearly could have

---

**7.** Although Bruno contends that defendants presented no evidence concerning the minimum qualifications of the positions covered by the studies, she herself testified at trial about the skills required for some of these positions. *See* app. at 588–601. In any case, the party seeking to introduce evidence has the burden of demonstrating that it is relevant so as to be admissible. *See* 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5166, at 69 n. 20 (1978).

been a verdict for the defendants. The door is now open in this circuit to the admission of plainly irrelevant statistical evidence in individual disparate treatment cases. What else can be concluded from an opinion upholding the admission of statistical evidence which is acknowledged not to account "for the minimum objective qualifications of the positions into which transfer or promotion was possible"?

I have not ignored the majority's conclusion that the defendants' objections to the statistical studies were not properly preserved. Majority op. at 767. The majority, however, reaches this conclusion only with respect to the new hires and termination studies inasmuch as it reaches the merits of the defendants' objections to the transfer and promotion study of persons over 40 as compared to those under 40.

In any event, the termination and new hire studies, even if valid, are of remote interest at best in this case. While there can be no doubt that Bruno's prior position as Director of the Central Order Processing Department was terminated, that was because it was eliminated as a result of a management decision not in issue here. Bruno's complaint is that she should have been given the position of Manager of Clinics Fulfillment, the position awarded to Dietrich. Accordingly, Bruno complains of a transfer decision. Thus, the transfer and promotion study is quite germane to this case while the new hires and termination studies have significantly less probative value.

Furthermore, as the majority acknowledges, even the new hires and termination studies were challenged by the defendants in a motion *in limine*. Majority op. at 767. The majority, however, finds this presentation insufficient to preserve the issue because the district court did not rule on the motion, and thus "there could be no reliance factor in this case," majority op. at 768, meaning that the defendants could not have relied on an earlier ruling thereby to excuse their failure to object when the evi-

dence was presented. I simply cannot agree with this analysis. The district court knew full well what the defendants' position was on this issue. In fact, in its opinion on the defendants' renewed objections to the statistical evidence in their post-trial motion for a judgment notwithstanding the verdict or for a new trial, the district court simply wrote:

Defendants also argue that Dr. Sullivan's studies were deficient. 'Statistical evidence is an appropriate method for establishing disparate impact as indirect evidence of age discrimination.' *Blum v. Witco Chemical Corp.*, 829 F.2d at 372. Defendant's argument goes to the weight of the evidence, which, of course, is an issue for the jury alone to decide. *See: Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 113 (3d Cir.), *cert. denied*, 484 U.S. 953, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987).

App. at 517.[8]

The district court thus did not suggest that the objection to the statistical evidence had been waived. Furthermore, even Bruno does not contend that the defendants waived their objections to admission of the statistical evidence on the basis of relevancy for in her brief on this appeal she states the following:

Defendants' objection to the admission of Plaintiff's statistical proofs is also waived since it is little more than a request for this Court to judge the credibility of competing expert witnesses. Such 'sufficiency' arguments, *though presented as 'relevance' objections*, were waived by non-inclusion in Defendants' directed verdict motion.

Brief at 27–28 (emphasis added).

Clearly, a failure to argue on a motion for a directed verdict that certain evidence is insufficient to support a position is not a waiver of a prior objection that the evidence was not relevant.

I dissent for a second reason as well. As the Supreme Court pointed out in *Ford Motor Co. v. EEOC*, 458 U.S. 219, 102 S.Ct.

---

8. This post-trial opinion treating arguments directed to the deficiency in the studies as going to weight rather than admissibility is consistent

with its charge which gave the jury the function of making threshold admissibility determinations.

3057, 73 L.Ed.2d 721 (1982), in a Title VII case a plaintiff's duty to minimize her damages includes the requirement that she accept a substantially equivalent job offered by the defendant, failing which the accrual of back pay liability will be tolled.[9] This duty, however, does not require her to settle her claim against the employer in whole or in part, and thus she need not accept an offer contingent on compromising her claim against her employer.

Here the jury found that although Bruno was offered a position of Manager, Inventory Planning and Control, at Bellmawr, New Jersey, which was superior or substantially equivalent to the position of Manager of Clinics Fulfillment, she acted as a reasonable person in the circumstances in rejecting the offer. The majority indicates that the relevant interrogatory was designed "to address the question whether the offer ... was conditioned on Bruno dropping her age discrimination claim." Majority op. at 770. This is an understandable conclusion inasmuch as the district court in denying the defendants' argument in their post-trial motion that Bruno failed to mitigate her damages relied solely on her testimony that the Bellmawr position offer was contingent on her dropping her ADEA claim. This offer was made in October 1985, when Bruno was still employed as Director of the Central Order Processing Department. The majority explains that the jury was justified in its conclusion because Bruno testified that she was told that she had to drop her claim if she took the job and she took that to mean that "you better do it or they're gonna find a way to get rid of you." Majority op. at 770.

The problem is, as the majority recognizes, majority op. at 770, that Bruno subsequently was told in a written memorandum from William Wright of December 16, 1985, that the Bellmawr job offer "is not, and never was, conditioned on dropping your claim."[10] Bruno received this memorandum while the offer remained open and well before her May 1986, lay off. Accordingly, Bruno, at her option, could have been continuously employed by the defendants at a position at least substantially equivalent to that which she was losing. Therefore, it was her own intransigence which caused her damages.

The majority disposes of the defendants' contention on this issue by indicating that the memorandum "merely presents a question of credibility. Notwithstanding the memo, the record contains sufficient evidence to support the jury's conclusion." Majority op. at 770–71. In a footnote the majority indicates that "[t]he defendants make no suggestion that Wright's memo gave rise to any new duty on Bruno's part." Majority op. at 771 n. 9.

The question of Bruno's continuing employment with the defendants, however, was subject to ongoing discussions and the defendants clearly contend that both before and after the December 16, 1985, memorandum the Bellmawr position was available to Bruno. Although the defendants claim that at most there was originally a misunderstanding regarding the terms of this offer, as they never made it conditional on Bruno's dropping her claim, I will assume that the offer was initially conditioned on her doing so. Nevertheless, the indisputable fact remains that while Bruno was still employed by the defendants, the Bellmawr position was open to her and she was told in writing that she could have it and still pursue her discrimination claim.

It is absolutely beyond my understanding how this written statement can be weighed against an earlier conversation and dismissed on a credibility basis. While I will not import the parol evidence rule into this opinion, I will simply say that obviously the written memorandum was controlling.

9. I agree with the majority and the parties that *Ford Motor Co.* applies to ADEA actions.

10. The germane paragraph in the memorandum reads in its entirety as follows:
(4) The Bellmawr job offer is not, and never was, conditional on dropping your claim. If it was, the condition would necessarily have been stated in writing. In the absence of such, the state agency would have to decide whether acceptance of the job had bearing on the claim. This is not the Company's prerogative. I do not understand how your perception of this matter evolved.

Surely in light of that memorandum, even ignoring other questions concerning the validity of compromises of ADEA claims,[11] it cannot seriously be contended that if Bruno had taken the Bellmawr position the defendants, on the basis of an alleged compromise, could have successfully moved for dismissal of her ADEA claim. Furthermore, I am not impressed with Bruno's statement that she thought she would be fired if she took the new job and continued to press her claim. To start with, that understanding came from the original oral offer which was superseded by the December 16, 1985, memorandum. In any event, if she were fired because she would not drop her claim, she would have had a new claim based on the retaliation. While I recognize that such a claim would be subject to proof problems, the same was true for her original claim.[12]

I have one final point with regard to the memorandum. Although it may well be that it was written on the basis of legal advice, what precluded the defendants from amending a previously unlawful offer to make it lawful? I should think that employers should be encouraged to amend conditional offers so as to come into compliance with the law. *Cf. Ford Motor Co. v. EEOC,* 458 U.S. at 229, 102 S.Ct. at 3064 (in a Title VII case defendants should be encouraged to make curative, unconditional job offers to claimants to bring themselves into voluntary compliance and end discrimination far more quickly than in litigation).

I have dissented on two bases. As the first, if adopted by the court, would lead to a new trial and the second to the entry of a judgment for the defendants, my dissent leads me to vote for entry of an order remanding the matter for entry of a judgment for the defendants.

---

**11.** *See, e.g., Cirillo v. Arco Chemical Co.,* 862 F.2d 448 (3d Cir.1988).

**12.** I realize that the position Bruno accepted and then rejected required a somewhat longer commute than the position awarded Dietrich. But that did not stop Bruno from finding it acceptable, because, as the majority points out, she first took the position but changed her mind four weeks later. Majority op. at 763. Obviously, the distance was no problem then. Furthermore, there was evidence that the Bellmawr commute was 45 minutes and thus the additional time for that commute over that to the Clinics Fulfillment position in Philadelphia could not have been substantial. Indeed, the majority does not even discuss the possibility that the commuting distance would have justified Bruno in turning down the Bellmawr position. In any event, if the jury could have made its finding that Bruno acted reasonably in rejecting the Bellmawr position because of the commuting distance, a new trial should be granted because the jury might nevertheless have made its finding that Bruno reasonably rejected the Bellmawr position on the basis of the offer being conditional on her dropping her claim. *See Bone v. Refco,* 774 F.2d 235, 242 (8th Cir 1985).