Colleen M. **MOYNIHAN**, Plaintiff,

v.

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, INC.,** Defendant.

**Civ. A. No. 88–0045–F.**

United States District Court, D. Massachusetts.

June 21, 1991.

**504**

Thomas J. Oppenheimer, Springfield, Mass., for plaintiff.

Denise M. D'Amour, Francis D. Dibble, Jr., Bulkley, Richardson and Gelinas, Springfield, Mass., for defendant.

## OPINION

FREEDMAN, Chief Judge.

### I. INTRODUCTION

This is a discrimination case in which plaintiff Colleen M. Moynihan claims that during the years 1984 through 1988 her employer, defendant Massachusetts Mutual Life Insurance Company ("Mass. Mutual" or "the company"), did not promote her because of her gender and age. Plaintiff alleged gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e), age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and both age and gender discrimination in violation of Mass. Gen.Laws ch. 151B ("chapter 151B").

Plaintiff's case was heard during a ten-day trial which concluded on June 17, 1991. A motion by Mass. Mutual to dismiss plaintiff's Title VII and chapter 151B claims was taken under advisement by the Court. Plaintiff's ADEA claim was submitted to a jury of six, which returned a verdict for Mass. Mutual.

Having heard the evidence and arguments in the case, the Court will deny Mass. Mutual's motion to dismiss and make the following findings of fact and conclusions of law with regard to the Title VII and chapter 151B claims. Judgment will be entered in favor of Mass. Mutual on all claims.

### II. FINDINGS OF FACTS

1. Plaintiff was born on February 24, 1938, making her forty-six years old in 1984, the year in which she alleges that age and sex discrimination against her commenced.

2. Plaintiff earned a Bachelor of Science degree in music education in 1959, and taught music in public elementary schools from 1960 through 1963. During 1966 and 1967 plaintiff worked for a John Robert Powers modelling school franchise which was operated in a house in Springfield. Plaintiff taught modelling classes, sold modelling courses to customers, and was paid a salary of $8,500 per year. Plaintiff returned to work as a public school music teacher during the years 1972 through 1976, and earned a Master of Education degree in 1976.

3. Plaintiff began working as an insurance sales agent for the John Mann Insurance Agency in 1976. In 1979 she was hired as a consultant in the Advanced Sales Department of the Monarch Life Insurance Company ("Monarch") of Springfield, at a salary of $14,000 per year. Plaintiff testified that she was given overall responsibility for four Monarch insurance product lines, and that she was responsible for cutting in half the eight-week time period which had been required for processing applications and delivering Monarch's in-

surance policies. She was earning a salary of $18,000 per year when she left Monarch in 1981.

4. Plaintiff earned a Chartered Life Underwriter designation ("CLU") in June 1981. Plaintiff also earned a designation from the National Association of Securities Dealers, a Securities and Exchange Commission license enabling her to act as a principal in a securities or equity operation, a Massachusetts license to sell insurance, and she has completed several insurance industry conferences and actuarial seminars.

5. In 1981 plaintiff went to work for Mass. Mutual as an Assistant Superintendent of the Pension Sales Department. This was a grade 13 position in the company's job hierarchy, which paid $28,400 per year. In November 1982, plaintiff was promoted to a grade 15 position, Associate Director of Product Planning and Development, at a salary of $33,103 per year.

6. Plaintiff served in the Associate Director position during the years 1982 through 1987. Plaintiff's annual salary was raised to $35,203 in 1983, to $37,603 in 1984, to $41,205 in 1985, and to $44,733 in 1986.

7. Mass. Mutual has established more than 100 "career paths" in order that the company's professional employees can gauge their expectations for promotion. Career paths have been established for such fields as actuaries, lawyers, claims examiners and pension consultants.

8. Plaintiff was interested in becoming an actuary, but did not pursue the matter after failing the first of ten actuarial exams in the fall of 1983.

9. In 1983 plaintiff was assigned to work in the Marketing Division under a newly-hired Vice President, James McKeon, who managed a new branch of the Marketing Division called the Individual Product Line ("IPL"). Plaintiff was responsible for preparing a budget for a unit responsible for developing insurance products called "Cost Center 835," and for preparing the IPL budget. Plaintiff also coordinated the activities of four of Mass. Mutual's subsidiary companies. Plaintiff testified that she had accountability for the expenses and budgets of each subsidiary company. Each subsidiary is licensed to do business in more than forty of the United States.

10. Each of the subsidiary companies had a board of directors comprised of other Mass. Mutual officers who were responsible for various subsidiary operations. Each subsidiary also had a comptroller who was responsible for the financial condition of the subsidiary. Plaintiff was not a comptroller or board member of any subsidiary.

11. Plaintiff participated in the establishment of a new subsidiary company in New York State. In June 1985 plaintiff recommended that responsibility for the New York State subsidiary be assigned to a Mass. Mutual officer who had a staff which was responsible for projects in development. Defendant's Exhibit ("Ex.") CCCCCC.

12. During 1984, 1985 and 1986 plaintiff submitted job descriptions to McKeon in an attempt to gain a promotion to a higher grade. The job description is the document which Mass. Mutual's Compensation Department uses to determine an employee's grade level and salary, in accordance with the standardized guidelines contained in a personnel ranking system known as the Hay Evaluation System.

13. The Hay Evaluation System measures the level of knowledge, problem solving and accountability required for a job, and supplies a formula for placing that job in a standardized grade level.

14. Plaintiff adopted the language contained in a standardized job description for Subsidiary Administrator which had been given a grade 16 rating by the Compensation Department. However, McKeon rejected plaintiff's proposed job description as inappropriate for plaintiff, since it assigned to the incumbent "overall responsibility" for subsidiary administration, and accorded discretion for "setting policy."

15. Plaintiff prepared other job descriptions, but McKeon did not submit them to the Compensation Department because

plaintiff had overstated her duties and responsibilities.

16. Plaintiff alleged that Mass. Mutual's failure to approve her job description and promote her to grade 16 during 1984 and 1985 was a violation which continued into 1986 and 1987 when she was also denied promotions to grade 17 and grade 18 positions. Plaintiff claimed that she became aware that she was being discriminated against in March 1985.

17. During 1984 and 1985 the Marketing Division was undergoing a reorganization in response to changes in insurance industry marketing strategies and demands for financial planning services by customers. Employees in the Marketing Division commonly performed a variety of tasks not listed in their job descriptions, and a number of employees were without officially approved job descriptions at that time.

18. Plaintiff's duties regarding the subsidiary companies were never reflected in her job description during the years the subsidiaries were considered part of the Marketing Division. Likewise, McKeon's overall responsibility, and accountability for the subsidiaries, was never reflected in his job description during those years.

19. In the spring of 1986, Mass. Mutual removed responsibility for operation of the subsidiary companies from the Marketing Division. Plaintiff's duties regarding the subsidiary companies were apportioned to other employees.

20. In August 1986 plaintiff was transferred to a temporary assignment called the STI project, which involved representation of the Marketing Division in the process of reorganization of the company's computer systems. Plaintiff's Ex. 56. Plaintiff's duties regarding the preparation of budgets were apportioned to other employees.

21. In August 1986 plaintiff told McKeon that females "fare worse" than males when job descriptions are submitted to the Compensation Department. Plaintiff asked McKeon to submit a job description describing her project management duties regarding the New York State insurance subsidiary company, a video sales project called Kiosk, and other IPL projects including the STI project. Defendant's Ex. GGG.

22. McKeon submitted the job description for Moynihan to the Compensation Department in September 1986. The Compensation Department was told the job description was for plaintiff's job, and undertook an informal evaluation. Defendant's Ex. K. The Compensation Department concluded that under the Hay Evaluation System, plaintiff's job involved the coordination of activities, and that the required level of knowledge, problem solving and accountability placed plaintiff's job at a grade 15. McKeon told plaintiff that her job had been assigned a grade 15.

23. Barbara Allen, a compensation analyst, testified that plaintiff's 1986 job description merited a grade 15 since the position did not require intense technical knowledge, any problem solving was done within clearly defined policies and guidelines, and because the position involved coordinating activities based on decisions which supervisors had already made, rather than a great deal of accountability for those decisions.

24. McKeon attempted to place plaintiff in a management position on the STI project, but his efforts were not successful.

25. To further support her claims of age and sex discrimination, plaintiff accused McKeon of making disparaging remarks during a staff meeting about another female employee at another company, and about another female employee at Mass. Mutual who had filed a complaint with the Equal Employment Opportunity Commission ("EEOC").

26. Plaintiff's accusations of age and sex-biased statements regarding the Mass. Mutual employee who had filed an EEOC complaint were not corroborated. Testimony by another female who worked for McKeon, Sandra Dimock, indicated that McKeon had handled the situation with sensitivity and respect toward the individual.

27. In 1984 Robert Knowles, an actuary with whom plaintiff was engaged in an intimate personal relationship, transferred

to the Marketing Division, and also was assigned to work under McKeon in a grade 19 position.

28. Plaintiff claimed McKeon allowed Knowles and other male employees to interrupt during her conversations with him, while conversely requiring her to wait to talk until McKeon completed conversations with male employees.

29. Plaintiff also pointed to evaluations prepared by McKeon which stated that she was performing a "jill of all trades" role, that she was perceived as aggressive by some people, that she needed to improve her listening skills, and that her duties were perceived as secretarial by some of her co-workers.

30. Testimony by Dimock and McKeon indicated that McKeon's evaluation regarding perceptions of plaintiff's personality was justified, and intended to help plaintiff. Dimock stated that plaintiff treated her in a "brash, overbearing and aggressive" manner, that plaintiff was frequently prone to overstate her authority in dealing with co-workers, and that difficulties with plaintiff were "an everyday type thing." Plaintiff's allegations regarding brusque treatment in comparison to McKeon's male subordinates were also contradicted by Dimock.

31. Supervisors from other departments complained to McKeon about the unreasonableness of orders which plaintiff had directed at them. Defendant's Ex. ZZ. McKeon testified that supervisors from several divisions had complained that plaintiff was known to assume more authority that she actually had.

32. McKeon's supervisor, Thomas B. Wheeler, criticized McKeon for "over-using the 'exceeded requirements' category" on employee evaluations. Wheeler suggested that plaintiff was not as strong an employee as one of her co-workers, and that such a distinction should be reflected in future evaluations. Defendant's Ex. CCC.

33. McKeon told plaintiff that her problems could be due to lack of confidence in herself, and he recommended that plaintiff improve her level of insurance industry technical skills.

34. As additional support for her claim of age and gender discrimination, plaintiff claimed McKeon and Knowles discriminated against her by treating a younger male employee, Jeffrey Stevenson, more favorably.

35. In February 1986 McKeon and Knowles recruited Stevenson from the Mass. Mutual Computer Systems Division to work in the Marketing Division in a new grade 17 position, with a salary of $59,000 per year, and the assurance that Stevenson would be promoted to Second Vice President if he performed properly. McKeon and Knowles needed Stevenson, since he was an actuary whose recommendations and ideas would be accorded greater weight by the other company divisions and departments.

36. Stevenson was born on April 27, 1954, making him thirty-one years old at the time of the transfer. Stevenson had ten years of experience as an actuary and manager in the insurance industry at that time. After earning an undergraduate degree in mathematics from the State University of New York at Binghamton in 1976, Stevenson went to work at the home office of the Security Mutual Life Insurance Company. He earned the designation as an Associate of the Society of Actuaries, and eventually passed the ten examinations required for designation as a Fellow in the Society of Actuaries ("FSA").

37. Stevenson joined Mass. Mutual in July 1982 as an actuary at grade 15, earning $42,500 per year plus a $3,500 annual bonus. Pursuant to Mass. Mutual's actuarial career path, an employee must be an FSA in order to enter a grade 15 position. In 1983, Stevenson became an Associate Actuary with the company, and was promoted to grade 16 with an annual salary of $47,500. Stevenson transferred to the Mass. Mutual Computer Systems Division in 1985 to become a manager and supervisor of a staff of computer analysts and operators. Stevenson was earning $54,000 per year in 1985.

38. When Stevenson left the Computer Systems Division to join the Marketing Di-

vision, he was given a $5,000 per year increase in salary to make up for the loss of eligibility for the productivity bonuses he had earned as a systems manager.

39. Due to competition with other insurance companies for actuarial staff, Mass. Mutual paid higher salaries to actuaries who worked in the Actuarial Division than the salaries paid to employees at identical grade levels in other divisions. So, although Stevenson's job in the Marketing Division was at the grade 17 level, the actual annual salary was less than $1,000 greater than the annual salary paid to an actuary working in the Actuarial Division at grade 16.

40. The personnel requisition for Stevenson's job called for an "understanding of pricing & design mathematics for insurance, annuity & health insurance products. Experience at managing major projects involving systems & actuarial staff. Familiarity with Mass Mutual IPL, computer systems & general agency system." Plaintiff's Ex. 36.

41. Stevenson's position in the Marketing Division was Director of Market Development, and reported directly to Knowles. Plaintiff's Ex. 36.

42. McKeon instructed Knowles to shift some of his work to Stevenson. Defendant's Ex. EEE.

43. Although the Marketing Division position was not on the actuarial career path, Stevenson used his actuarial and mathematical skills in resolving issues regarding insurance costs and prices which had been delegated to him by Knowles. Stevenson also performed some of the functions which plaintiff had previously carried out.

44. In a performance evaluation prepared by Knowles, Stevenson was criticized for deficient listening skills, in the same manner which McKeon had critiqued Moynihan. Knowles also criticized Stevenson for a tendency to dominate discussions, and for being "too loud."

45. Knowles testified that he never considered plaintiff for the job which Stevenson performed because she was not quali-

fied. Knowles stated that as an actuary, Stevenson was capable of identifying issues relating to computer processing of insurance data and tax law. Knowles testified he had no intention to discriminate against plaintiff, but rather, he testified that he "loved her."

46. Mass. Mutual has a policy of discouraging managers from supervising employees who are family members or persons with whom they are conducting intimate personal relationships, in order to avoid allegations of favoritism and to prevent sexual harassment claims which might be filed if the intimate relationship sours.

47. During the course of their intimate personal relationship, Knowles became aware that plaintiff was "frustrated" and "wanted a promotion." Knowles suggested plaintiff write a research paper on tax issues. Plaintiff wrote the paper, and it was praised by McKeon.

48. On November 28, 1986 plaintiff filed a sex and age discrimination complaint against Mass. Mutual with the Massachusetts Commission Against Discrimination and the EEOC.

49. In early 1987 Donald Cameron was appointed a Senior Vice President of the Marketing Division.

50. In February 1987, plaintiff returned to the Marketing Division and resumed work on the Kiosk and Find marketing projects. Kiosk, an unsuccessful video sales program, was cancelled after several Kiosk booths placed in airports failed to generate sufficient customer response. Find was a computerized system used by sales agents to calculate insurance premiums and benefits for customers.

51. In a bid for promotion, plaintiff sent a letter to Cameron on February 18, 1987, claiming she had "15 years of successful marketing and operations experience" involving supervision of multi-million dollar budgets and "up to 180 people." The years of experience were based on the time plaintiff worked for the Powers modelling school, and her experience since 1976 with the Mann Agency, Monarch, and Mass. Mutual. Plaintiff's resume claimed that she

was overseeing four Mass. Mutual subsidiaries in 1987. Defendant's Ex. KKK.

52. Plaintiff admitted that her resume statement regarding responsibility for the four insurance subsidiaries was an exaggeration.

53. On May 1, 1987 plaintiff sent Cameron a memo and a job description for Cameron's "review and/or approval." Plaintiff's Exs. 24, 48. The job description was based upon the grade 17 job description of employee Denis Shine which had been in force in 1984. The revised Shine job description afforded the incumbent "a wide degree of latitude" in carrying out responsibilities and claimed accountability for the Kiosk and Find Marketing programs.

54. Plaintiff claimed that she had the same duties and responsibilities as Shine, a younger male, that the company refused to promote her to grade 17 or 18 and, therefore, that she had been discriminated against.

55. Shine was born on August 19, 1945, making him thirty-nine years old in 1984. Shine graduated from the University of Connecticut Law School in 1972. He was admitted to the Connecticut and Massachusetts Bars, and also passed the ten examinations required to obtain the CLU designation. Shine served as a trust officer with the Third National Bank of Springfield from 1973 through 1978, and then worked in the estate and business planning department of the Connecticut Mutual Life Insurance Company for one year. Shine served as President of the Hampden County Estate Planning Council.

56. Shine was hired by Mass. Mutual in 1979 for a grade 15 position in the Advanced Sales Career Path. By 1983 he had advanced to a grade 17 position, earning $45,100 per year.

57. Shine had worked with plaintiff on the Kiosk and Find projects. Shine testified that plaintiff represented the Marketing Division during planning sessions for the programs, and managed "focus groups" to test customer response. Shine was the content expert responsible for setting up the two projects, and for insuring that the tax and insurance information remained current and accurate. Shine testified that it was not likely that a person without a law degree would have the same level of expertise in estate and tax planning which he had applied to the projects.

58. In 1985, Shine became supervisor of the four attorney staff in the company's Financial Planning Department and was promoted to a grade 18, Second Vice President, earning $56,670. As a Second Vice President, Shine was assigned to set up and serve as an officer in MML Investor Services, an independent subsidiary company which employed a large staff responsible for dissemination of financial planning information and advice to Mass. Mutual's sales agents. Defendant's Ex. TTTT.

59. Shine resigned from Mass. Mutual in 1987 and transferred his files on the Kiosk and Find projects to plaintiff. At that time, Find had been fully established and disseminated to the field agents.

60. Cameron assigned Shine's accountability for Kiosk and other projects to Second Vice President Stan Pond in 1987. Plaintiff did not have authority or control over the Kiosk or Find programs.

61. Cameron told plaintiff on May 13, 1987 that she should have submitted her job description to Pond, since Pond was plaintiff's new supervisor. Cameron explained that plaintiff's job description could not be finalized until Pond's job description was approved. Defendant's Ex. L.

62. Plaintiff was promoted to a grade 16 position in July 1987, with an annual salary of $48,650 plus a retroactive bonus. The promotion was approved after Pond, who was plaintiff's supervisor, explained to plaintiff that the job description which plaintiff had sent to Cameron was not accurate, and that plaintiff had taken credit for more than the duties she was responsible for.

63. Diane Rock was the compensation analyst who evaluated plaintiff's 1987 job description. Rock testified that the problem solving skills and knowledge required for the Find project would not be as great as in prior years when Find was being

developed, since the Find system was fully developed and disseminated. Therefore, under the Hay Evaluation System, plaintiff would not be credited with a great number of points in the problem solving and knowledge categories for her Find responsibilities.

64. Susan Alfano, Mass. Mutual's Vice President for Corporate Human Relations, testified that promotion to a grade 16 position required nine to twelve years of experience in insurance or a related industry in order that the employee would be qualified to make decisions and take on increased accountability at that level. As an example, Alfano was promoted to grade 16 after twelve years of experience with the company.

65. Plaintiff was awarded merit raises, bringing her annual salary to $51,083 in 1988.

66. Plaintiff relinquished her duties involving the unsuccessful Kiosk project in 1988, and she administered the discontinuation of the Find system in 1989. Defendant's Exs. HHHHHH and LLLLLL. In plaintiff's words, the company decided that the Find project was "supposed to slip quietly into the sunset." Defendant's Ex. MMMMMM.

67. On March 1, 1988, Stevenson recommended a bonus for himself, plaintiff and another co-worker, based on their "turning off the spicket" of cost center 835, which Stevenson described as a having been a "sort of catch all slush fund" during prior years. Plaintiff's Ex. 67. The bonuses were not approved.

68. Plaintiff filed the instant lawsuit against Mass. Mutual in this Court on March 14, 1988.

69. Plaintiff broke off her intimate personal relationship with Knowles in 1988, after the couple had lived together for a time.

70. Stevenson was never promoted to Second Vice President, and he left the company in August 1988 to become a Vice President and Deputy Chief Actuary at the ITT Linden Life Insurance Company.

71. Plaintiff's salary was raised to $53,509 in 1989 and to $56,185 in 1990.

72. Plaintiff offered statistical evidence prepared by Norman Aitken, Ph.D., a professor of economics at the University of Massachusetts. Dr. Aitken has testified as an expert in three employment discrimination cases.

73. Dr. Aitken analyzed the careers of 121 Mass. Mutual employees who were in grade 15 positions on January 1, 1983. With regard to plaintiff's claim of age discrimination, Dr. Aitken found that between 1983 and 1989, a significantly higher percentage of promotions for employees who were under age forty as of 1983 in comparison with the percentage of promotions given to employees who were age forty or older as of 1983.

| | Promoted to Grade 16 (or higher) | Promoted to Grade 17 (or higher) | Promoted to Grade 18 (or higher) |
|---|---|---|---|
| Employees Under Age 40 | 76% | 51% | 36% |
| Employees Age 40 & Over | 48% | 15% | 11% |

*See* Plaintiff's Ex. 90. Dr. Aitken concluded that there was a "clear association between age and promotion rates" and therefore it was very unlikely a chance occurrence that more "employees under age 40"

had been promoted than their older co-workers.

74. Mass Mutual presented statistical evidence prepared by David Peterson, Ph. D., a professor of statistics at Duke University. Since 1974, Dr. Peterson has prepared statistical analyses and expert testimony on behalf of plaintiffs and defendants in 150 discrimination cases involving sex, race, age and union affiliation. Dr. Peterson has taught a course at Duke University Law School on the use of statistics in detecting and measuring employment discrimination, and he has written articles and a book on the use of statistics in discrimination lawsuits.

75. Dr. Peterson testified that Dr. Aitken's analysis did not take into account that each year during the 1983–1989 period some employees in the "under age 40" category had entered the protected "age 40 and over" category. As these employees grew older during the years of the study, their careers moved forward and some were promoted to higher positions. In re-ality, some of the employees who were counted as being promoted "under age 40" by Dr. Aitken were actually promoted when they were over forty. Aitken explained that those employees who entered the protected class during the period of his study "will always be younger" than the plaintiff and the other employees who were already forty years of age in 1983. Additionally, Dr. Aitken failed to consider the fact that some of the employees he analyzed had retired during the successive years of his survey and were not available for further promotion. See Defendant's Exs. AAAAA, YYYY. Yet, Dr. Aitken still counted the retirees as part of his percentages. Dr. Aitken speculated that some of the retirees may have left the company because they had no opportunity for promotion.

76. With regard to plaintiff's claim of gender discrimination, Dr. Aitken compared the promotion rates of males and females, using the same 121 employees.

|  | Promoted to Grade 16 (or higher) | Promoted to Grade 17 (or higher) | Promoted to Grade 18 (or higher) |
|---|---|---|---|
| Male Employees | 66% | 36% | 25% |
| Female Employees | 50% | 19% | 17% |

See Plaintiff's Ex. 91. Dr. Aitken conceded that the disparity between male and female promotions was statistically significant at only one promotional level: promotions to positions at grades 17 or higher.

77. Dr. Aitken did not consider the effect which career paths and Equal Employment Opportunity ("EEO") coded job categories had on his study. As an example, the Advanced Sales Career Path allowed for promotion up to grade 17 and the Actuarial Career Path allowed for promotion up to grade 19, but the Client Field Services Career Path allows for promotion only to grade 16. See Defendant's Ex. YYYY.

78. The Client Field Services Career Path sets out the promotion parameters for Office Managers in more than one hundred Mass. Mutual field offices throughout the United States. Female employees predominate in the EEO coded category for Field Office Manager (EEO Code A94). Most of the employees in this category who were at grade 15 in 1983 were female. See Defendant's Ex. ZZZZ. Promotion to grade 16 positions in this career path is governed by the number of life insurance applications and policies which are processed by each office. Thus, a field office manager could advance from a grade 15 position to the pinnacle grade 16 position only if the field office had the required volume of business.

79. Dr. Peterson testified that it was significant that Dr. Aitken did not consider the fact that no field office manager could be promoted beyond grade 16 in reaching the conclusion that discrimination against Mass. Mutual's female employees existed at grade 17 and above.

80. Dr. Peterson also testified that professionals such as attorneys and actuaries who began their careers at grade 15 positions have greater opportunities for promotion which do not exist in other divisions, and that failure to consider the EEO category codes for these occupations would mischaracterize a lack of promotional opportunity. As an example, 100% of the attorneys in Dr. Aitken's study (EEO Code B16) were promoted to grade 16 or higher, and more than 70% of the actuaries (EEO Code B11) and real estate investment directors (EEO Code B31) were promoted to positions at grade 16 or higher. In contrast, only 9% of the field office managers were promoted to the top grade 16 positions, due to the limited number of field offices which generated the volume of business required for promotion to that level. *See* Defendant's Exs. XXXX, YYYY.

81. In an effort to show that plaintiff was the victim of a combination of age and gender discrimination, Dr. Aitken testified that Mass. Mutual had given men under age forty a significantly higher number of promotions than women over forty. Plaintiff's Ex. 89. However, this comparison was based on the same incomplete analysis. Dr. Aitken also acknowledged that the percentage of women under forty who were promoted was nearly identical to the percentage of men under forty who were promoted.

82. Dr. Peterson analyzed the careers of the same 121 employees who were in grade 15 positions in 1983. However, Dr. Peterson recalculated the age for each employee during each year of the study, and did not count employees who had resigned, retired, been demoted or who had already been promoted to each grade in an earlier year of the study. Dr. Peterson testified that his analyses properly focussed on whether male and female employees age forty or older were treated differently than employees age thirty nine or younger.

### Promotions to Grade 16 or Above

| Sex | Age | Actual Promotions | Expected Promotions | Std.Deviation |
|---|---|---|---|---|
| Male | 39 — | 28 | 25.6 | 0.78 |
|  | 40 + | 28 | 33.0 | —1.29 |
| Total |  | 56 | 58.6 |  |
| Female | 39 — | 9 | 7.1 | 1.21 |
|  | 40 + | 9 | 8.4 | 0.33 |
| Total |  | 18 | 15.4* |  |

### Promotions to Grade 17 or Above

| Sex | Age | Actual Promotions | Expected Promotions | Std.Deviation |
|---|---|---|---|---|
| Male | 39 — | 14 | 11.2 | 1.32 |
|  | 40 + | 17 | 21.3 | —1.34 |
| Total |  | 31 | 32.5 |  |
| Female | 39 — | 4 | 1.8 | 2.70 |
|  | 40 + | 3 | 3.7 | —0.64 |
| Total |  | 7 | 5.5 |  |

### Promotions to Grade 18 or Above

| Sex | Age | Actual Promotions | Expected Promotions | Std.Deviation |
|---|---|---|---|---|
| Male | 39 — | 7 | 6.3 | 0.48 |
|  | 40 + | 14 | 16.7 | —0.97 |
| Total |  | 21 | 23.0 |  |

| Sex | Age | Actual Promotions | Expected Promotions | Std.Deviation |
|---|---|---|---|---|
| Female | 39 − | 4 | 2.2 | 2.06 |
| | 40 + | 2 | 1.9 | .19 |
| Total | | 6 | 4.0* | |

* Total does not sum due to rounding.

Defendant's Ex. CCCCC. Dr. Peterson testified that the standard deviations he calculated indicated that males over age forty got somewhat less than their statistically expected share of promotions. He also concluded that females under age forty received a disproportionately larger number of promotions. Overall, Dr. Peterson concluded that males and females over and under forty got their proportionate share of promotions.

83. The standard deviation is the method by which statisticians measure the difference between what is statistically predicted as normal, and what actually happened in real life.

84. Dr. Peterson opined that Dr. Aitken's study proved only that if Mass. Mutual decided who would be promoted by writing the names of the 121 employees on slips of paper and drawing those same names from a hat each year, it would be very unlikely that as many employees under the age of forty would have been picked for promotion during 1983 through 1989 as were actually promoted by the company. In Dr. Peterson's opinion, Dr. Aitken's study of the age and gender of the 121 employees measured only the likely random chance for promotion, and failed to consider important nondiscriminatory variables which influenced promotion opportunities in the company.

### III. CONCLUSIONS OF LAW

1. The Court finds that plaintiff has not stated facts which give rise to an inference of either age or gender discrimination. However, rather than grant Mass. Mutual's motion to dismiss the Title VII and chapter 151B claims, the Court will discuss the merits of the case, and enter judgment for Mass. Mutual.

2. Once all the evidence has been received in a discrimination case such as this, the Court must determine which of two analytical frameworks should be applied to that evidence. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 278, 109 S.Ct. 1775, 1805, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). The approach set out in *Price Waterhouse* is not applicable since plaintiff presented no direct evidence of discrimination. Instead, the order or proof established in the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is appropriate in the instant case, since plaintiff seeks to raise an inference of discrimination through the use of circumstantial evidence. "The framework established in *McDonnell Douglas* and its progeny 'is essentially a method for ferreting out discriminatory animus where direct evidence of intent is lacking....'" *Petitti v. New England Tel. & Tel. Co.*, 909 F.2d 28, 34 (1st Cir.1990) (Title VII gender discrimination), *quoting Lipsett v. University of Puerto Rico*, 864 F.2d 881, 899 (1st Cir. 1988).

3. The *McDonnell Douglas* framework is appropriately applied to failure-to-promote cases, *Patterson v. McLean Credit Union*, 491 U.S. 164, 186–87, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989), it applies to age as well as gender discrimination claims, *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014–19 (1st Cir.1979), and it governs the analysis of circumstantial evidence in claims of age and gender discrimination pursuant to chapter 151B. *Johansen v. NCR Comten, Inc.*, 30 Mass.App.Ct. 294, 568 N.E.2d 611 (1991).

4. Under the *McDonnell Douglas* approach:

> [t]he initial burden is on the plaintiff to produce evidence of unlawful discrimination, i.e., to make a prima facie case. If the plaintiff manages to make a prima facie case, the burden shifts to the defendant to produce evidence of lawful rea-

sons for [the personnel action involving] the plaintiff. Should the defendant succeed in so doing, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the reasons, ostensibly legitimate, put forward by the employer are a pretext for the real reason, unlawful discrimination.

*Id.* at 296–97, 568 N.E.2d at 612–13, *citing McDonnell Douglas*, 411 U.S. at 802–05, 93 S.Ct. at 1824–26 and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *see also Samuels v. Raytheon Corp.*, 934 F.2d 388, 391–92 (1st Cir.1991).

5. In essence, the elements of the prima facie case require that plaintiff prove she applied for an available position for which she was qualified, but was rejected under circumstances giving rise to an inference of unlawful discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94; *Johansen v. NCR Comten, Inc.*, 30 Mass.App.Ct. at 296 n. 3, 568 N.E.2d at 612 n. 3.

■ 6. Plaintiff did not establish that she was qualified for a grade 16 position prior to 1987, when Mass. Mutual did promote her to that level. The evidence established that plaintiff's knowledge and years of experience were commensurate with the grade 15 position which she held during the years she alleged discrimination and a continuing violation by the company. The facts set out above establish that the technical skill and responsibility with which plaintiff carried out her duties was not the same as the younger male employees to which she has compared herself.

■ 7. Plaintiff did not establish that she was passed over for promotion to a grade 16 position under circumstances giving rise to an inference of discrimination. The only evidence offered by plaintiff which bears the faintest hint of age or gender bias were the remarks which she claims McKeon made in regard to another female employee. The Court finds that this uncorroborated allegation does not give rise to an inference of gender or age animus against plaintiff. The evidence indicated that McKeon attempted to assist plaintiff in developing her potential and career.

■ 8. Even if the Court accepted plaintiff's evidence as stating a prima facie case, and proceeded to step two of the *McDonnell Douglas* analysis, Mass. Mutual has offered lawful reasons for its handling of plaintiff's promotion requests. It would be reasonable to expect that reorganization of the Marketing Division during the years of turmoil in the insurance industry might prevent every employee from working under an exact job description. Delay in settling on such a description is understandable in the case of an employee such as plaintiff who was assigned to special projects of short term or changing nature.

■ 9. An employer is entitled to consider characteristics of an employee such as personality, qualifications, or quality of work product, when deciding whether to hire, fire or promote. *Loeb v. Textron, Inc.*, 600 F.2d at 1012, 1019 n. 6. The reasons for promoting Stevenson and Shine are apparent from their level of education, technical skills and experience in the insurance industry. Even without considering the level of actuarial, computer systems and insurance industry experience possessed by Stevenson, Mass. Mutual had a legitimate policy which discouraged Knowles from assigning duties to plaintiff which would place her in a position under his supervision.

10. Finally, plaintiff offered statistical evidence and an expert's conclusions in an effort to show that the company's nondiscriminatory reasons were pretextual, and that Mass. Mutual was liable for a continuing violation of the state and federal discrimination laws. Statistical evidence comes "in infinite variety" and its "usefulness depends on all of the surrounding facts and circumstances." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 996 n. 3, 108 S.Ct. 2777, 2789 n. 3, 101 L.Ed.2d 827 (1988) (racial discrimination) (Opinion of O'Connor, J.), *quoting Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856–57, 52 L.Ed.2d 396 (1977). There may be some statistical studies

which are "so incomplete as to be inadmissible as irrelevant." *Bazemore v. Friday,* 478 U.S. 385, 400 n. 10, 106 S.Ct. 3000, 3009 n. 10, 92 L.Ed.2d 315 (1986) (Brennan, J., concurring).

■ 11. Plaintiff's statistical expert, Dr. Aitken, pointed out that it is impossible to consider every variable when conducting a statistical analysis. However his conclusions were based on a statistical study of a group of Mass. Mutual employees which did not account for important variables. Statistical evidence offered to prove pretext in a case alleging disparate treatment involving an individual plaintiff need not be as precise and conclusive as the statistical evidence required to prove discrimination and disparate impact against a large class of employees. *See, e.g., Bruno v. W.B. Saunders Co.,* 882 F.2d 760 (3rd Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 880, 107 L.Ed.2d 962 (1990); *Krodel v. Young,* 748 F.2d 701, 709 (D.C.Cir.1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985); *but see Bruno,* 882 F.2d at 774–75 (Greenberg, J., dissenting) (arguing defective statistical evidence was irrelevant and should not have been admitted). In the instant case involving the alleged disparate treatment of an individual plaintiff, the Court admitted plaintiff's statistical evidence and expert testimony.

■ 12. Plaintiff's statistical evidence would not be sufficient to establish that the legitimate business reasons stated by Mass. Mutual were a pretext or cover up for discrimination. Likewise, the statistical evidence does not establish a continuing violation of the discrimination laws.

■ 13. There are two kinds of continuing violations, serial violations and systemic violations. A serial violation "is composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong...." *Jensen v. Frank,* 912 F.2d 517, 522 (1st Cir.1990), *citing Mack v. Great Atlantic & Pacific Tea Co., Inc.,* 871 F.2d 179, 183 (1st Cir.1989). Plaintiff did not establish that she was subjected to a single violation, let alone a continuing series of violations.

■ 14. In contrast to a serial violation, a "systemic violation has its roots in a discriminatory policy or practice" by an employer. *Jensen v. Frank,* 912 F.2d at 523. Plaintiff's statistical evidence does not establish such a discriminatory pattern or practice by Mass. Mutual.

15. The Court accords little weight to plaintiff's statistical evidence and the testimony of Dr. Aitken. Dr. Aitken ignored important nondiscriminatory explanations for varying promotion opportunities in the company, i.e., whether the employee still worked for the company, whether the employee had entered the protected age group, whether the employee had already been promoted to the grade level being analyzed, and whether or not the employee was in an EEO-coded category for professionals such as actuary or attorney. The factors omitted from Dr. Aitken's statistical study give rise to the likelihood that his conclusions mischaracterize the promotional opportunities available to various employees of the company.

16. In contrast, Dr. Peterson's analysis included the essential factors of whether each employee in the statistical study was still working for the company and whether he or she had already advanced to the grade level at issue or to the protected age group. Dr. Peterson provided further insight by analyzing the occupations of the employees, and the opportunity for promotion within those occupational categories. The Court credits Dr. Peterson's conclusion that the actual number of female employees over age forty who were promoted from the group of 121 Mass. Mutual employees studied was statistically indistinguishable from the number of employees who would have been promoted if promotions were made in conformance with a strict age and gender quota system which considered no other characteristics of the employee.

## IV. CONCLUSION

Mass. Mutual's motion to dismiss is DENIED; judgment is entered for the defen-

**516**

dant, Massachusetts Mutual Life Insurance Company.

It is So Ordered.