Jacqueline WATSON, Appellant/Cross–Appellee,

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY ("SEPTA"), Appellee/Cross–Appellant.

Nos. 98–1832, 98–1833, 98–1834.

United States Court of Appeals, Third Circuit.

Argued: May 24, 1999.

Opinion Filed: March 20, 2000.

Jablon, Epstein, Wolf & Drucker, Alan B. Epstein (Argued), Spector, Gadon & Rosen, Philadelphia, PA, for Appellant/Cross–Appellee, Jacqueline Watson.

Obermayer, Rebmann, Maxwell & Hippel, Kenneth L. Oliver, Jr. (Argued), Philadelphia, PA, for Appellee/Cross–Appellant, Southeastern Pennsylvania Transportation Authority.

Before: GREENBERG and ALITO, Circuit Judges, and ACKERMAN, Senior District Judge.*

* The Honorable Harold A. Ackerman, Senior United States District Judge for the District of New Jersey, sitting by designation.

## OPINION OF THE COURT

ALITO, Circuit Judge:

Jacqueline Watson filed this sex and disability-discrimination action against her former employer, the Southeastern Pennsylvania Transportation Authority ("SEPTA"). After the jury returned a verdict for SEPTA, the Magistrate Judge before whom the case was tried by consent denied Watson's motion for a new trial but partially granted her motion for attorney's fees and costs. Watson appealed, and SEPTA cross-appealed the partial award of attorney's fees and costs.

Watson's appeal focuses on the Magistrate Judge's jury instructions. The first issue concerns Watson's disparate-treatment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. S 2000e–2 (1994). Specifically, we address whether an amendment enacted as part of the Civil Rights Act of 1991, P.L. 102–166 (the "1991 Act"), eliminated the distinction between the standards of causation applicable in, on the one hand, so-called "mixed-motive" cases, in which we have held that a defendant may be held liable upon a showing that an illegitimate factor was a "motivating" factor in the adverse action, and, on the other hand, so-called "pretext" cases, in which we have held that a defendant may be held liable upon a showing that an illegitimate factor was a "determinative" factor in the adverse action. In accordance with decisions of the Second and Fourth Circuits[1] (the only other courts of appeals that have analyzed this question), we hold that this distinction survives the passage of the 1991 Act, and since this is a "pretext" case, we also hold that the Magistrate Judge did not err in giving a standard determinative-factor instruction. In addition, because we hold that the Magistrate Judge did not commit reversible error with respect to any of the other portions of the jury instructions that Watson has challenged on appeal, and because the Magistrate Judge did not abuse her discretion in setting fees and costs, we affirm the judgment in its entirety.

### I.[2]

Watson began working for SEPTA in 1983. By 1986, she was promoted to a job as a Construction Equipment Operator, a position that literally required "heavy lifting." In February 1990, she was involved in a work-related accident that permanently injured her neck and back and rendered her unable to engage in the lifting required by her position.

In May 1990, Watson returned to work. Her physician instructed her not to lift more than 20 pounds. SEPTA accommodated her disability by assigning her to a position in Quality Control at the equipment yard.

In late 1992, a male supervisor was assigned to oversee Watson. In 1993, the new supervisor assigned Watson clerical duties in addition to her quality control tasks. Watson claimed that her disability prevented her from doing the clerical work because of the strain placed on her back by having to sit and stand frequently during the working day. Watson claims that her position in Quality Control was thereafter assigned to a non-disabled male.

SEPTA's Medical and Labor Relations Departments met to discuss the positions available to Watson given her 20–pound weight-lifting restriction. In July 1994, SEPTA assigned her to a job as a mail run operator, a position that required her to drive a Chevrolet Suburban and to deliver mail to several SEPTA locations. Accord-

---

**1.** *Fields v. New York State Office of Mental Retardation and Developmental Disabilities,* 115 F.3d 116, 117 (2d Cir.1997); *Fuller v. Phipps,* 67 F.3d 1137, 1143–44 (4th Cir.1995).

**2.** We set forth the facts in a light most favorable to SEPTA because the jury returned a verdict in its favor on Watson's sex and disability-discrimination claims. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990); *Hahn v. Atlantic Richfield Co.,* 625 F.2d 1095, 1098–99 (3d Cir.1980).

ing to Watson, she declined this job because she would have been required to lift more than 20 pounds. SEPTA claims it told her that she could break larger packages into smaller ones if any exceeded the 20–pound weight limit. After Watson declined the job, she went on medical leave starting in September 1994. She became an inactive SEPTA employee, receiving no pay but continuing to be covered by SEPTA's medical plan.

In February 1996, Watson filed this lawsuit, alleging, among other things, that SEPTA discriminated against her because of her sex and disability, in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.* (1994), the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (1994), and the Pennsylvania Human Relations Act (PHRA), 43 P.S.A. §§ 951 *et seq.* (West 1991). From June 1996 forward, SEPTA's attorneys were in contact with Watson's attorney in an effort to locate a position for her within SEPTA that would properly accommodate her disability.

In November 1996, the Magistrate Judge entered summary judgment in SEPTA's favor with respect to Watson's claims for punitive damages under Title VII and the ADA, as well as with respect to her retaliation and intentional infliction of emotional distress claims. The Magistrate Judge denied SEPTA's summary judgment motion, however, with respect to Watson's disparate treatment sex and disability-discrimination claims and set those claims for trial.

After a settlement conference in which the Magistrate Judge urged SEPTA to consider reactivating Watson, SEPTA rehired her as a mail run operator. She nevertheless proceeded to trial to recover back pay and compensatory or punitive damages—the latter under the PHRA. After the close of evidence, the Magistrate

Judge entered judgment as a matter of law in SEPTA's favor on the PHRA claim for punitive damages. The jury returned a verdict in SEPTA's favor on the remaining sex and disability-discrimination claims. After the Magistrate Judge denied Watson's motion for a new trial based on alleged errors in the jury charge, Watson petitioned for an award of attorney's fees based on her reinstatement to the mail run operator position. The Magistrate Judge awarded Watson partial attorney's fees in the amount of $26,985.03 and costs in the amount of $5,686.25.

Watson appeals from the denial of her motion for a new trial. This appeal concerns the validity of the jury charge. Both parties appeal the award of fees and costs.

## II.

## A.

## 1.

The chief issue in this appeal is whether the Magistrate Judge properly charged the jury on the law of sex and disability discrimination. If Watson preserved her objection to the charge, the inquiry is whether the charge, " 'taken as a whole, properly apprises the jury of the issues and the applicable law.' " *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 275 (3d Cir.1998) (citation omitted). If the objection was not preserved, review should be exercised sparingly. *Id.* Under such circumstances, we will overturn a verdict "only where the error is fundamental and highly prejudicial or if the instructions are such that the jury is without adequate guidance on a fundamental question and our failure to consider the error would result in a miscarriage of justice." *Id.*

During the charging conference, Watson objected to several aspects of the charge.[3]

---

**3.** Because the Title VII instructions are at the center of this appeal, we set them forth below in detail:

> The plaintiff ... claims that SEPTA discriminated against her because of her sex, by improperly considering the fact that she is female in failing to place her in positions

First, she contended that the Magistrate Judge should not have instructed the jury that she was required to show that her "sex was a determining factor in her going on inactive status" or that "but for plaintiff's sex, the adverse employment action would not have occurred." (App. 135). Watson argued that the 1991 Act had changed the standard of causation in Title VII "pretext" cases from a requirement that the illegitimate criterion be a "deter- mining" factor of the adverse action to a requirement that the illegitimate criterion be merely a "motivating" factor. She did not then nor does she now take issue with the District Court's use of a determinative factor instruction with respect to her claim under the ADA.

Next, Watson objected to the inclusion in the Title VII and ADA jury instructions of the *McDonnell Douglas* burden-shifting scheme.[4] Once a case is submitted to the

> that she desired, and in plaintiff's going on inactive status. . . .
>
> To meet her burden of proving that she was discriminated against by SEPTA on the basis of sex under Title 7 or the PHRA, the plaintiff must prove by a preponderance of the evidence that she was qualified for a position of employment at SEPTA, that de- spite being qualified, she suffered adverse employment consequences that give rise to an inference of sex discrimination.
>
> If the plaintiff fails to prove any of these elements, then your verdict must be for the defendant. If, however, the plaintiff proves all of these elements, then your analysis does not end there.
>
> The defendant in this case has articulated a legitimate nondiscriminatory reason for placing Mrs. Watson on inactive status. By doing so, the defendant has met its burden of producing some explanation of its ac- tions other than discrimination. It is not necessary that the reason be a good one, or even that you believe it to be true. All the defendant need do is state a reason other than a perception that plaintiff was disabled to explain its actions. It is the plaintiff's obligation to prove that sex was the reason for the defendant's action.
>
> By meeting this intermediary burden, the defendant has shifted the burden of persua- sion back to the plaintiff, to show, by a preponderance of the evidence, that the reason offered by SEPTA is false, or is a pretext for sexual discrimination. Here, as in the disability determination context, the plaintiff may meet this burden of proof ei- ther by persuading you that a discriminato- ry reason more likely than not motivated the defendant or by persuading you that the defendant's proffered explanation is unwor- thy of belief.
>
> In order for the plaintiff to recover under Title 7 and/or PHRA for sex discrimination, she must prove by a preponderance of the evidence that SEPTA intentionally discrimi- nated against her because of her sex. Ulti- mately, you must decide whether Jacque- line Watson's sex was a determining factor

> in her going on inactive status. Again, for your purposes, determining factor means that but for the plaintiff's sex, the adverse employment action would not have oc- curred.
>
> (App. 130–35).

4. The Magistrate Judge charged the jury as follows with respect to the ADA:

> To recover against the defendant under the ADA . . ., the plaintiff has the burden of proving all three of the following elements by a preponderance of the evidence. If you find that the plaintiff has proven none, one, or only two of the three elements, then your verdict must be for the defendant with re- spect to the plaintiff's disability claims un- der the ADA.
>
> First, the plaintiff has the burden of prov- ing that she either has a disability, or has a record of disability, or was "regarded as disabled by her employer." . . .
>
> Second, the plaintiff also has the burden of proving she is a "qualified individual," meaning that she can, with or without rea- sonable accommodation, perform the essen- tial functions of the employment position that she holds or desires. . . .
>
> And, third, the plaintiff has the burden of proving that she has suffered adverse em- ployment action because of her disabili- ty. . . .
>
> [I]f you find that the plaintiff has proved that she was disabled, has a record of dis- ability or was regarded as disabled by SEP- TA, then you must additionally consider whether the plaintiff has proven that she is otherwise qualified to perform the essential functions of her job with or without a rea- sonable accommodation, and you must con- sider whether the plaintiff has suffered ad- verse employment action because of her disability.
>
> If all three of these conditions have been met, your analysis does not end there. The defendant in this case has articulated a legitimate, nondiscriminatory reason for placing Ms. Watson on inactive status. By

trier of fact, Watson contended, the *McDonnell Douglas* scheme is no longer relevant and, in order to avoid confusion, should not be described to the jury.

After the charge was read but before the jury returned its verdict, Watson also objected to the inclusion of the following language in both the disability and sex-discrimination charges:

> It is not necessary that the [non-discriminatory] reason be a good one, *or even that you believe it to be true.* All the defendant need do is state a reason other than a perception that plaintiff was disabled to explain its actions. It is the plaintiff's obligation to prove that [an impermissible factor] was *the reason* for the defendant's action.

(App. 141) (emphasis added). Watson argued that this language erroneously implied that the defendant "could give a reason that was totally fallacious and that could carry the day." (App. 143).

Finally, Watson argued that instructing that an impermissible factor must be "the reason" for the defendant's action erroneously implied that liability attaches only if an impermissible factor is the only reason for an adverse decision, as opposed to merely a motivating or determinative reason.

### 2.

We first address whether the Magistrate Judge properly concluded that the "motivating" factor test set forth in the 1991 Act applies only to "mixed-motive" cases.

 Our court's cases have recognized two types of disparate treatment employment discrimination actions—"pretext" and "mixed-motive"—and have applied different standards of causation depending on the type of case the plaintiff presented.[5] *See, e.g., Griffiths v. CIGNA*

doing so, the defendant has met its burden of producing some explanation of its actions other than discrimination. It is not necessary that the reason be a good one, or even that you believe it to be true. All the defendant need do is state a reason other than a perception that plaintiff was disabled to explain its actions. It is the plaintiff's obligation to prove that a perceived disability was the reason for the defendant's action.

It is the plaintiff's obligation to prove that a perceived disability was the reason for the defendant's action. By meeting this intermediary burden, the defendant has shifted the burden of persuasion back to the plaintiff, to show, by a preponderance of the evidence, that the reason offered by SEPTA is false, or is a pretext for disability discrimination. The plaintiff may meet this burden of proof either by persuading you that a discriminatory reason more likely than not motivated the defendant, or by persuading you that the defendant's proffered explanation is unworthy of belief.

If you find that Mrs. Watson has proven that she was disabled, or that she had a record of disability, or that SEPTA regarded her as disabled, that she was a "qualified individual;" that an adverse action was taken with regard to her employment; and you find that Mrs. Watson has proven that the reason offered by SEPTA for its treatment of her is a pretext for disability discrimina-

tion, then your verdict must be for Mrs. Watson under the ADA. Ultimately, the question that you must answer to yourselves is whether plaintiff's disability, record of disability, or her being regarded as disabled, served as a determining factor for SEPTA as to Jacqueline Watson going on inactive status. The phrase "determining factor" means that but for the plaintiff's disability, record of disability, or her being regarded as disabled, the adverse employment action would not have occurred. (App. 127–30).

5. The "pretext" and "mixed-motive" labels are misleading. As we noted in *Miller v. CIGNA Corp.*, 47 F.3d 586, 597 n. 9 (3d Cir. 1995) (en banc), a case that does not qualify for a burden-shifting instruction under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), may nevertheless involve challenged action by an employer that resulted from two or more motives. Moreover, in a non-*Price Waterhouse* case, a plaintiff need not necessarily show "pretext" but may prevail simply by showing, through direct or circumstantial evidence, that the challenged action resulted from discrimination. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994). Nevertheless, we use the terms "pretext" and "mixed-motive" because they are familiar and the introduction of new terminology might lead to even greater confusion.

*Corp.*, 988 F.2d 457, 472 (3d Cir.1993) (recognizing distinction between "pretext" and "mixed-motive" cases in Title VII retaliatory discharge action), *overruled on other grounds by Miller v. CIGNA Corp.*, 47 F.3d 586, 595 (3d Cir.1995) (en banc) (recognizing distinction in ADEA action). In "pretext" cases of the type at issue here, we have held that a jury must be charged that in order to find for the plaintiff, it must conclude that consideration of the impermissible factor was "a determinative factor" in the adverse employment action. *See Smith*, 147 F.3d at 279 (ADEA); *Miller*, 47 F.3d at 595 (ADEA); *Hook v. Ernst & Young*, 28 F.3d 366, 369 (3d Cir.1994) (Title VII disparate treatment); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) ("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome."). In "mixed-motive" cases, by contrast, we have held that a plaintiff need only show that the unlawful motive was a "substantial motivating factor" in the adverse employment action. *Miller*, 47 F.3d at 594.

This distinction in standards of causation in "mixed-motive" and "pretext" cases can be traced to the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). There, the plurality held that once a plaintiff demonstrates that the adverse decision is the result of mixed motives (*i.e.* that it is the "result of multiple factors, at least one of which is illegitimate" and the illegitimate factor played "a motivating part" in the adverse decision), the burden shifts to the employer to persuade the jury by a preponderance of the evidence that it would have reached the same decision even if the protected trait had not been considered. *Price Waterhouse*, 490 U.S. at 244–45, 260, 109 S.Ct. 1775 (plurality opinion). This shift in the burden of persuasion makes an employer potentially liable upon

a causation showing—that an illegitimate criterion was a motivating, although not a determinative, factor in the adverse employment decision—that is less exacting than the causation test in the usual "pretext" case, where consideration of a protected trait must be shown to be a determinative factor in the adverse action. *See Biggins*, 507 U.S. at 610, 113 S.Ct. 1701. The *Price Waterhouse* plurality opinion also created an affirmative defense for the employer that, if proven, absolved the employer completely of any Title VII liability. *See Price Waterhouse*, 490 U.S. at 242, 109 S.Ct. 1775 ("We conclude that … an employer *shall not be liable* if it can prove that, even if it had not taken gender into account, it would have come to the same decision regarding a particular person.") (emphasis added) (plurality opinion); *Tanca v. Nordberg*, 98 F.3d 680, 681 (1st Cir. 1996) ("Put another way, the Court held that it was an affirmative defense to a charge of unlawful intentional discrimination to show that the employer would have made the same decision even in the absence of an unlawful motive.").

Justice O'Connor's concurrence in *Price Waterhouse* limited the scope of the plurality's holding, however, by setting forth the predicate necessary to trigger the shift in the burden of persuasion described above. *Id.* at 262, 109 S.Ct. 1775. Pursuant to Justice O'Connor's concurrence, only plaintiffs who "demonstrate[ ]" with "sufficiently direct" evidence that an impermissible factor was a motivating factor are entitled to the shift in the burden of persuasion. See *Price Waterhouse*, 490 U.S. at 275, 109 S.Ct. 1775 (O'Connor, J., concurring); *Fuller v. Phipps*, 67 F.3d 1137, 1141 (4th Cir.1995). As Justice O'Connor made clear in her concurrence, the *Price Waterhouse* shift in the burden of persuasion does not apply to "pretext" cases, in which plaintiffs prove intentional discrimination indirectly through the burden-shifting paradigm set forth in *McDonnell Douglas* and

its progeny.[6] See *Price Waterhouse*, 490 U.S. at 277–78, 109 S.Ct. 1775. Such plaintiffs, under *Price Waterhouse*, are still required to satisfy the more stringent "determinative factor" test for causation. *Id.*

Congress responded to *Price Waterhouse* with Section 107(a) of the 1991 Act, which amended Title VII to include the following provision:

> Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e–2(m). Section 107(a) of the 1991 Act thus mandates liability in a set of cases (the scope of that set is, of course, the issue here) in which consideration of a protected trait was a motivating factor in the adverse employment action even though permissible factors independently explain the outcome. This plainly alters the scope of the *Price Waterhouse* affirmative defense, which, as explained above, completely absolved the employer from liability if it could adequately prove that the adverse action would have been taken even if the protected trait had not been considered. Significantly, Section 107(a) does not, at least on its face, alter the other significant holding of *Price Waterhouse* set forth in Justice O'Connor's concurrence—i.e., the distinction drawn between "pretext" and "mixed-motive" cases and the evidentiary showing necessary to trigger a shift in the burden of persuasion with respect to causation. *See Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 899 n. 8 (3d Cir.1993)

(1991 Act overruled "that portion of *Price Waterhouse* that permitted an employer to avoid liability if it could demonstrate it would have taken the same action in the absence of discriminatory motive") (emphasis added); *Tanca*, 98 F.3d at 681 ("*Congress partially overruled Price Waterhouse* in the 1991 Act by allowing a finding of liability and limited relief to plaintiffs in mixed motive cases") (emphasis added); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 (10th Cir.1999) ("Section 107(a) ... overruled the Supreme Court's decision in *Price Waterhouse to the extent* that that decision holds an employer can avoid a finding of liability by proving it would have taken the same action even absent the unlawful motive") (emphasis added); *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 124 (2d Cir. 1997) (Section 107 "was enacted solely to overrule *the part* of *Price Waterhouse* that allowed an employer to avoid all liability by prevailing on its dual motivation defense") (emphasis added).

Although Section 107(a) mandates a finding of liability whenever an illegitimate factor motivates an adverse employment action, Section 107(b) limits the remedies available to a plaintiff when the employer proves that it would have taken the same action even if the impermissible factor had not been present. Pursuant to this modification of the *Price Waterhouse* affirmative defense, if the employer successfully demonstrates that the outcome would have been the same even without discriminatory animus, the court may not award monetary damages but may award certain declaratory and injunctive relief, as well as attorney fees and costs demonstrated to be directly attributable to pursuing a claim under Section 107(a). 42 U.S.C. § 2000e–5(g)(2)(B).[7]

---

6. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *See also, e.g., Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

7. The text of this section reads:

On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—

We now turn to the primary issue in this appeal—whether Section 107(a) of the 1991 Act eliminated the distinction between the standards of causation applicable to "pretext" and "mixed-motive" cases. In analyzing this question, we first look to the statutory text, *see In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 444 (3d Cir.1996), and our reading of the text is informed by developments in Title VII case law that immediately preceded the passage of the 1991 Act—specifically, the Supreme Court's decision in the *Price Waterhouse* case. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 250, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) ("The 1991 Act is in large part a response to a series of decisions of this Court interpreting the Civil Rights Acts of 1866 and 1964.").

While we certainly do not pretend that the text of Section 107(a) speaks with unmistakable clarity, the text suggests to us that Section 107(a) was designed to apply only to *Price Waterhouse* "mixed-motive" cases. First, the description of the set of cases to which Section 107(a) applies—*i.e.*, cases in which "the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated this practice"—is a precise description of *Price Waterhouse* "mixed-motive" cases. Statutory drafters seeking to target that class of cases would use exactly this sort of language—whereas drafters wishing to target all disparate treatment cases would have no need to do so. If the drafters of Section 107(a) had wanted to reach all disparate treatment cases against employers, they could have simply said something like the following:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established under subsection (a) of this section when the evidence shows that race, color, religion, sex, or national origin was a motivating factor for any employment practice.

Under these circumstances, there would have been no need to include the additional phrase "even though other factors also motivated the practice." Section 107(a), 42 U.S.C. § 2000e–2(m). *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997)(we strive to read statutes to "avoid a result that would render statutory language superfluous, meaningless, or irrelevant.").

Moreover, it hardly seems to be a coincidence that the term "demonstrates" in Section 107(a) is precisely the term that Justice O'Connor repeatedly used in key portions of her *Price Waterhouse* concurrence to describe the showing that a plaintiff must make to trigger a shift in the burden of persuasion. *See* 490 U.S. at 275, 109 S.Ct. 1775 ("[I]n a case like this one, where an employee has *demonstrated* by direct evidence . . . .") (emphasis added); *id.* at 276, 109 S.Ct. 1775 ("[O]nce a Title VII plaintiff has *demonstrated* by direct evidence that discriminatory animus played a significant or substantial role in the employment decision, the burden shifts to the employer to show that the decision would have been the same absent discrimination.") (emphasis added); *id.* ("Requiring that the plaintiff *demonstrate* that an illegitimate factor played a substantial role in the employment decision identifies those employment situations where the deterrent purpose of Title VII is most clearly implicated.") (emphasis added). The use of this very term in Section 107(a) makes perfect sense if the drafters wished to denote cases in which the plaintiff shows by what Justice O'Connor called "direct evidence" that an impermissible factor

(i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and

(ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).
42 U.S.C. § 2000e–5(g)(2)(B) (1994).

played a role in the challenged decision. See *Webster's Third New International Dictionary* 601 (1971)(defining "demonstrate" as "to manifest clearly, certainly, or unmistakably"). By contrast, the term "demonstrates" is not the most apt choice if the drafters wanted to describe, not just cases in which the plaintiff offers "direct" evidence of discriminatory animus, but also the great number of disparate treatment cases in which the plaintiff, proceeding under *McDonnell Douglas*, establishes the elements of a prima facie case and urges the factfinder to infer discriminatory animus from the employer's asserted failure to offer a credible alternative reason for the contested employment action.

Section 107(a)'s complementary statutory provision, Section 107(b), 42 U.S.C. § 2000e–5(g)(2)(B), provides further contextual evidence that Congress intended for Section 107(a) to apply only to "mixed-motive" cases. As we explained above, Section 107(b) alters the scope of the affirmative defense created by *Price Waterhouse* (by making it a defense, not to liability, but merely to certain forms of relief). If Section 107(a) had been meant to establish a new standard of causation for *all* disparate treatment cases against employers, then Section 107(b) naturally would have been drafted to apply to all

cases brought *under 42 U.S.C. § 2000e–2(a)*, the provision that sets out unlawful employment practices by employers. Instead, Section 107(b) applies only to "a claim in which an individual proves a violation *under Section 2000e–2(m)*"(emphasis added). This language suggests that Congress intended to draw a distinction between most disparate-treatment cases against employers (which are brought under 42 U.S.C. § 2000e–2(a)) and a subset of cases "in which an individual proves a violation under Section 2000e–2(m). [Section 107(a) ]." This choice of language is understandable if, as we hold, Section 107(a) applies only to *Price Waterhouse* "mixed-motive" cases, but there would be no apparent reason for this language if Section 107(a) applied to all disparate treatment cases against employers. For these reasons, the statutory text suggests to us that Section 107(a) applies only to "mixed-motive" cases.

The legislative history points to the same conclusion.[8] The House Report's discussion of Section 107 appears in a section entitled, "The Need to Overturn Price Waterhouse." H.R.Rep. No. 102–40(I), *reprinted in* 1991 U.S.C.C.A.N. at 583. The first paragraph of this discussion identifies the portion of the holding in *Price Waterhouse* that the legislation was meant to

---

**8.** As one commentator has noted, "[t]he Civil Rights Act of 1991 is unusual in that it comes with little traditional legislative history." David A. Cathcart and Mark Snyderman, *The Civil Rights Act of 1991*, SB36 ALI–ABA 277, 295 (1997). The main source of legislative history that we cite is House Report No. 102–40, which was written before Senator Danforth introduced the substantially revised bill that was to become the 1991 Act. Significantly, however, the language that became Section 107 of the 1991 Act did not undergo *meaningful change from the time of the first* version of the bill until the enactment of the 1991 Act. *See* H.R. 1, 102nd Cong. § 5(a)(1) (January 6, 1991) ("Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a contributing factor for any employment practice, even though other factors also contributed to such

practice"); H.R. 1, 102nd Cong. § 5(a)(1) (March 11, 1991) (same); H.R. 1, 102nd Cong. § 5(a)(1) (May 18, 1991) (same); H.R. 1, 102nd Cong. § 103(a)(1) (June 7, 1991) ("Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for such employment practice, even though other factors also contributed to such practice"); H.R. 1, 102nd Cong. § 103(a)(1) (June 12, 1991) (same); H.R. 1, 102nd Cong. § 103(a)(1) (July 9, 1991) (same). House Report No. 102–40 was written in April and May of 1991, *see* H.R.Rep. No. 102–40, *reprinted in* 1991 U.S.C.C.A.N. at 549, and the only difference in language between § 103(a)(1) of the June 12 version of the House bill and Section 107(a) of the 1991 Act is the substitution of the phrase "motivated the practice," for "contributed to such practice" in the final clause.

overrule, namely, the holding that *"the defendant may avoid a finding of liability . . . by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account," id.* (emphasis added). Moreover, a footnote takes pains to note that the legislation was not intended to overrule the decision *in toto. Id.* n. 39. Later, the Report emphasizes that Section 107 was designed to "overrule[ ] one *aspect* of the Supreme Court's decision in *Price Waterhouse"* and that Section 107 "would clarify that proof that an employer would have made the same employment decision in the absence of discriminatory reasons, is relevant to determine not the liability for discriminatory employment practices, but only the appropriate *remedy". Id.* at 586 (emphasis on "one aspect" added, emphasis on "remedy" in original). As the Second and Fourth Circuits have concluded, the legislative history strongly supports an interpretation of the statute that preserves the distinction between "mixed-motive" and "pretext" cases. *See Fields*, 115 F.3d at 124 ("[T]he House Committee report makes clear that section 107 was enacted solely to overrule the part of Price Waterhouse that allowed an employer to avoid all liability by prevailing on its dual motivation defense"); *Fuller*, 67 F.3d at 1144 ("[T]he legislative history makes evident that Congress sought to alter the standards of liability in mixed-motive cases.").

Our holding is also buttressed by the Supreme Court's opinion in *Landgraf v. USI Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In *Landgraf*, the Court held that Section 102 of the 1991 Act, which created a right to recover compensatory and punitive damages for certain violations of Title VII and further provided that any party could demand a trial by jury if such damages were sought, did not apply retroactively to a Title VII case that was pending on appeal when the 1991 Act was enacted. The Court prefaced its analysis of this issue with a discussion of the scope of the 1991 Act in

which it described various sections of the 1991 Act as responding to recent Supreme Court decisions. *See id.* at 250–51, 114 S.Ct. 1483. In its discussion, the Court described Section 107, the provision at issue in this case, by stating, albeit in dictum, that "§ 107 responds to *Price Waterhouse v. Hopkins*, by setting forth standards applicable in 'mixed motive' cases." *Landgraf*, 511 U.S. at 251, 114 S.Ct. 1483 (citations omitted).

As previously noted, the Second and Fourth Circuits have reached the same conclusion that we do here. In *Fuller v. Phipps*, 67 F.3d 1137 (4th Cir.1995), the Fourth Circuit held that "Section 107 was intended to benefit plaintiffs in 'mixed-motive' cases; it has nothing to say about the analysis in 'pretext' cases such as this one." *Fuller*, 67 F.3d at 1143. The Fourth Circuit first pointed to the dictum in *Landgraf* that we noted above. The Court next analyzed the text of the statute, which it found "contemplate[d] a mixed-motive setting [by] specifically referring to situations in which the plaintiff demonstrates that an illicit consideration has influenced the employment decision and in which other factors may also have played a role." *Fuller*, 67 F.3d at 1143–44. Finally, the Fourth Circuit examined the legislative history and found it "evident that Congress sought to alter the standards of liability in mixed-motive cases." *Id.* at 1144. The *Fuller* Court therefore concluded that "only those plaintiffs who satisfy the evidentiary burden entitling them to mixed-motive treatment can qualify for an instruction under Section 107." *Id.* at 1144.

The Second Circuit also considered whether "the distinction between so-called 'pretext' cases and 'dual motivation' cases . . . survived the 1991 amendments to Title VII." *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 117 (2d Cir. 1997). After noting that "the House Committee report makes clear that section 107

was enacted solely to overrule the part of *Price Waterhouse* that allowed an employer to avoid all liability by prevailing on its dual motivation defense," the Second Circuit held that "the distinction between 'dual motivation' and 'substantial motivation' jury instructions survives the 1991 Act." *Id.* at 124.[9]

Finally, we believe it bears mentioning that adopting the interpretation that Watson advocates would not, on balance, bring greater simplicity to employment discrimination law. While Watson's interpretation would mean that the "motivating factor" standard would apply to all disparate treatment Title VII claims against employers, the "determinative factor" standard would still apply to certain other Title VII claims, *see Woodson*, 109 F.3d at 931 (holding that Section 107 does not apply to Title VII retaliatory discharge cases brought under 42 U.S.C. § 2000e–3), as well as a variety of common employment discrimination claims under other statutes, such as the Age Discrimination in Employment Act. *See Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 278 (3d Cir.1998) (ADEA). As the case now before us illustrates, it is common for employment discrimination complaints to combine claims under different statutes. Thus, adoption of Watson's interpretation would mean that in a case involving, say, a Title VII race claim, a Title VII retaliation claim, and an ADEA claim, the trial judge would face the challenge of trying to make lay jurors understand that "because of" means one thing as applied to the first claim and another thing as applied to the other claims. It is doubtful that Congress would want such a result, and we are reluctant to put trial judges in this predicament. Compared with the confusion that would result from adopting Watson's interpretation, retaining the distinction between the standards of causation in "pretext" and "mixed motive" cases will cause fewer practical problems because cases in which the plaintiff can make the demonstration demanded under Justice O'Connor's *Price Waterhouse* concurrence are relatively uncommon, and it is even more uncommon to have a *Price Waterhouse* "mixed motive" claim and a "pretext" claim in the same case.

■ We thus hold that Section 107 does not alter the distinction in standards of causation that apply to "pretext" and "mixed-motive" cases and, accordingly, that the "determinative" factor jury instructions in this case were correct.

---

**9.** We are not persuaded by the contrary authority on which Watson relies. Although *Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1084–85 (11th Cir.1996), applied section 107(a) in a "pretext" case, the Court did not explain its reasons for doing so and did not analyze any of the arguments that persuaded the Second and Fourth Circuits—and that convince us—that section 107(a) has a narrower scope. Indeed, it is not apparent from the *Harris* opinion that the Court considered the possibility that section 107(a) might be restricted to "mixed motive" cases. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 935 n. 29 (3d Cir.1997). We therefore do not find *Harris* and comparable district court decisions, *see Woodson*, 109 F.3d at 935 n. 29 (citing cases) to be persuasive.

Watson also relies on *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344 (7th Cir.1995), for the proposition that § 107(a) applies to "pretext" as well as "mixed motive" cases. It is doubtful, however, whether *Hennessy* actually supports that proposition.

In *Hennessy*, the trial judge instructed the jury in accordance with section 107(a), but there was "direct evidence" of discriminatory intent on the part of the employer (*see* 69 F.3d at 1350), and therefore the case may have qualified for special treatment under *Price Waterhouse* prior to the 1991 Act. Moreover, the appellant in *Hennessy* did not challenge the causation standard set out in the instruction, but instead argued that the trial court "erred when it failed to instruct the jury on the [*McDonnell Douglas*] burden-shifting method of proving intentional discrimination by indirect evidence." *Id.*

Last, Watson cites the *Ninth Circuit Manual of Model Jury Instructions* 138 (West 1997) and the Eighth Circuit's *Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit* 74 (West 1993). Like the Second Circuit in *Fields*, we find the jury instruction manuals to be unpersuasive in light of the text of Section 107 and its legislative history. *See Fields*, 115 F.3d at 123.

### 3.

We next consider Watson's argument that we should reverse and order a new trial because the Magistrate Judge instructed the jury regarding the *McDonnell Douglas* burden-shifting scheme. In *United States Postal Service v. Aikens*, 460 U.S. 711, 713, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the Supreme Court wrote that "when the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the [challenged action]," the question whether the plaintiff "really [established] a prima facie case is no longer relevant," and "the factfinder must then decide whether the rejection was discriminatory." *Id.* at 714–15, 103 S.Ct. 1478.

While *Aikens* lends support to Watson's argument, we held in *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 280 (3d Cir.1998)(emphasis added), that jurors must be instructed that they are "entitled to infer, but need not, that the plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met *if they find that the facts needed to make up the prima facie case* have been established and they disbelieve the employer's explanation for its decision." We reconciled *Aikens* by noting that "[t]his does not mean that the instruction should include the technical aspects of the *McDonnell Douglas* burden shifting, a charge reviewed as unduly confusing and irrelevant for a jury." *Id.* at 280 n. 4. In *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 347 n. 1 (3d Cir.1999), we provided extensive guidance on the place of the McDonnell Douglas scheme in jury instructions.

██ Under *Smith*, it is clearly proper to instruct the jury that it may consider whether the factual predicates necessary to establish the prima facie case have been shown. Consequently, we reject Watson's argument that the Magistrate Judge erred in this case in instructing the jury on the factual elements of the prima facie case.

██ The Magistrate Judge did err, however, in including language regarding the defendant's intermediate burden of producing evidence of a legitimate non-discriminatory reason for its actions. As we noted in *Smith*, whether the defendant has met its intermediate burden of production under the *McDonnell Douglas* test is a "threshold matter to be decided by the judge." *Smith*, 147 F.3d at 279 (quoting *Cabrera v. Jakabovitz*, 24 F.3d 372, 382 (2d Cir.1994)).

> [T]he jury need not be told anything about a defendant's burden of production. . . . [W]hether or not the facts of plaintiff's prima facie case are disputed, the jury needs to be told two things: (1) it is the plaintiff's burden to persuade the jurors by a preponderance of the evidence that the . . . job . . . was denied because of race (or, in other cases, because of some other legally invalid reason), and (2) the jury is entitled to infer, but need not infer, that this burden has been met if they find that the [facts needed to make a prima facie case] have been established and they disbelieve the defendant's explanation.

*Id.* Because the defendant's intermediate burden of production is an issue solely for determination by the court, the Magistrate Judge erred by including an instruction discussing SEPTA's intermediate burden of production in this case.

██ Whether we should vacate the judgment because of this error is another matter, however. In *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 768 (3d Cir.1989), we assumed that it was error to instruct the jury on the circumstantial order of proof developed in *McDonnell Douglas*, but we affirmed the jury's verdict after noting that the charge "fairly and adequately described the shifting burdens of production and persuasion." *Id.* at 768. We held that "[e]ven assuming that submission to the jury of the question whether the plaintiff made out a prima facie case [was] error, . . . the instructions . . . could

[not] have confused and misled the jury such that the defendants would be prejudiced." *Id.*

■ Here, Watson's main claim of prejudice is based on the following statement made by the Magistrate Judge in describing SEPTA's burden of production: "It is not necessary that the reason be a good one, or even that you believe it to be true." See footnote 3, *supra.* As noted, Watson argued that this statement implied that SEPTA "could give a reason that was totally fallacious and that could carry the day." (App. 143). Although Watson's argument has some force, we are not ultimately persuaded that a new trial should be ordered. First, the Magistrate Judge's statement, although perhaps capable of misinterpretation, was not literally incorrect. The employment discrimination laws involved here permit an employer to take an adverse employment action for a reason that is not "true" in the sense that it is not objectively correct. For example, if an employer sincerely believes that an employee has stolen company funds and discharges the employee for this reason, the employer should not be held liable under the statutes in question just because it turns out that the employee did not steal the funds and that the employer's reason for the discharge was in this sense not "true." Second and more important, the statement related to an issue—whether SEPTA had met its burden of production—that the jury was not called upon to decide. The Magistrate Judge told the jury in unmistakable terms that SEPTA had met this burden and that the plaintiff now bore the burden of proving that SEPTA discriminated against her because of her sex. Thus, even if jurors misunderstood the Magistrate Judge's statement, the likelihood of prejudice is not great since the statement was not expressly connected to any question that the jury was

required to decide. Considering the charge as a whole, we do not find this statement to amount to reversible error.

**4.**

■ Watson also complains that the charge impermissibly implied that sex had to be the sole reason, as opposed to a but-for cause, of the adverse action. She points to the following language in the charge:

It is the plaintiff's obligation to prove that sex was the reason for the defendant's action.

(App. 134) (emphasis added). While this language, taken out of context, might imply an erroneous sole-cause standard—a standard that we rejected in *Miller*, 47 F.3d at 594—the charge taken as a whole adequately informed the jury that an impermissible factor need only be a determinative, or but-for cause, of the adverse employment action. We perceive no reversible error in this aspect of the charge.

**5.**

■ The Magistrate Judge also erred in another aspect of the sex discrimination instruction, although as with the error we noted above, we decline to vacate the judgment because of it. In *Smith*, the Court held it to be reversible error to fail to instruct the jurors that "they are entitled to infer, but need not, that the plaintiff's ultimate burden of demonstrating intentional discrimination by a preponderance of the evidence can be met if they find that the facts needed to make up the prima facie case have been established and they disbelieve the employer's explanation for its decision." 147 F.3d at 280. While the Magistrate Judge gave a variant of the *Smith* charge for the ADA claim,[10] she did not explicitly

10. This portion of the charge reads:
If you find that Ms. Watson has proven that she was disabled or that she had a record of disability, or that SEPTA regarded her as

disabled; that she was a "qualified individual"; that an adverse action was taken with regard to her employment; and you find that Ms. Watson has proven that the reason

reiterate that point in the sex-discrimination charge. *See* App. 134–35.[11] This was error in light of *Smith*.

■ Watson, however, did not pre-serve an objection on this ground, and therefore we decline to vacate the judgment. In order to preserve an issue for appeal, counsel must state "distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. Here, Watson objected to the inclusion of language regarding the defendant's burden of production but made no reference to the absence of a *Smith* charge. Watson's attorney did say the following:

> All of the cases that deal with pretext ... say that my obligation is to either prove by affirmative evidence that there was discrimination or demonstrate that the—the reason given was not true. If that's the case, Your Honor, then if initially they had no burden of telling the truth [with respect to the legitimacy of the non-discriminatory explanation], then there wouldn't be that additional responsibility on my part to sustain that burden.

(App. 148); *see also* (App. 92–93) (objection to language regarding SEPTA's intermediate burden of production). But these statements cannot fairly be said to have

put the Magistrate Judge on notice of the issue with respect to which it erred. *Cf. Smith*, 147 F.3d at 275–76 (plaintiff requested instruction that jury "could infer intentional discrimination if it found the Borough's reasons for not renewing the contract to be false or not credible").

■ Because the error identified by Watson for the first time on appeal was neither fundamental nor highly prejudicial, and because we do not perceive a miscarriage of justice in the absence of vacatur and remand, we decline to vacate the judgment based on the error in the District Court's jury instruction.

### B.

Both parties also object to the Magistrate Judge's award of partial attorney's fees and costs to Watson. SEPTA argues that, because the jury returned a verdict in its favor, Watson was not the "prevailing party" under the attorney's fee provision of Title VII. 42 U.S.C. § 2000e-5(k) (court may award reasonable attorney's fees and costs to "the prevailing party" under Title VII). Watson argues that her reinstatement to the mail run position was causally related to the litigation and constituted meaningful relief. SEPTA contends, in turn, that reinstatement to the mail run

offered by SEPTA for its treatment of her is a pretext for disability discrimination—then your verdict *must be* for Ms. Watson, under the ADA.
(App. 131–32) (emphasis added). This is a variant of the proper charge because the emphasized language requires a finding of liability when the jury finds the plaintiff proved the elements of her prima facie case and the jury disbelieves the defendant's proffered non-discriminatory explanation. As we made clear in *Smith*, however, a jury may, but need not, infer intentional discrimination under these circumstances. *Smith*, 147 F.3d at 279. We need not take any measure other than to note this error because the jury found for SEPTA notwithstanding the error in Watson's favor.

**11.** The relevant portion of the charge reads:

> By meeting this intermediary burden, the defendant has shifted the burden of persuasion back to the plaintiff, to show, by a

preponderance of the evidence, that the reason offered by SEPTA is false, or is a pretext for sexual discrimination. Here, as in the disability determination context, the plaintiff may meet this burden of proof either by persuading you that a discriminatory reason more likely than not motivated the defendant or by persuading you that the defendant's proffered explanation is unworthy of belief. In order for the plaintiff to recover under Title 7 and/or PHRA for sex discrimination, she must prove by a preponderance of the evidence that SEPTA intentionally discriminated against her because of her sex. Ultimately, you must decide whether Jacqueline Watson's sex was a determining factor in her going on inactive status. Again, for your purposes, determining factor means that but for the plaintiff's sex, the adverse employment action would not have occurred.
(App. 134).

position was not the relief Watson sought in this suit. Rather, SEPTA maintains that the relief Watson sought was reinstatement to her "quality control" job.

We review the amount of the fee award for abuse of discretion. Whether the Magistrate Judge applied the proper standard is reviewed de novo, and we review the Magistrate Judge's factual findings for clear error. *See Rode v. Dellarciprete*, 892 F.2d 1177, 1182–83 (3d Cir. 1990).

In order to qualify as a "prevailing party," Watson was required to show that she achieved relief and that there was a causal connection between the litigation and the relief. *See Wheeler by Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 131 (3d Cir.1991). ("[A]s long as a plaintiff achieves some of the benefit sought in a lawsuit, even though the plaintiff does not ultimately succeed in securing a favorable judgment, the plaintiff can be considered the prevailing party for purposes of a fee award."); *see also Clark v. Township of Falls*, 890 F.2d 625, 627 (3d Cir.1989) ("[I]f plaintiffs could establish that their suit was the catalyst for the changes, they were entitled to prevailing party status despite the fact that the district court had ruled against them.").

The Magistrate Judge's conclusion that Watson "prevailed" based on her reinstatement to the mail run position is supported by ample circumstantial evidence. Watson was not returned to her job until after the suit was filed, after SEPTA's motion for summary judgment was denied, and after the Magistrate Judge urged SEPTA to reinstate her. Indeed, SEPTA admitted that its efforts to locate a position within SEPTA that would be acceptable to Watson started in late 1996, *after* Watson had filed suit. *See Metropolitan Pittsburgh Crusade for Voters v. City of Pittsburgh*, 964 F.2d 244, 251 (3d Cir.1992) (court should look to "the sequence of events in determining whether a lawsuit is a material factor in bringing about a desired change").

SEPTA also argues that reinstatement to the mail run position was not "relief" because SEPTA did not change the job in any way in response to the lawsuit. The Magistrate Judge's conclusion that reinstatement was relief is not erroneous. As Watson stated in her deposition testimony, she sought to return to SEPTA in any capacity. (Reply at 21; App. 477–78). The fact that she was not reinstated to the quality control position— a position she admittedly preferred—does not foreclose recovery of attorney fees since she was reinstated to a position that addressed the concerns raised by her lawsuit. *See Wheeler*, 950 F.2d at 131.

Watson also argues that the Magistrate Judge erred in reducing the lodestar by two-thirds. The Magistrate Judge found that "the Plaintiff's limited success in relation to what she initially sought from her suit warrant[ed] a reduction in the award of attorneys' fees" by two-thirds. (Because SEPTA did not object to the award of costs, the Magistrate Judge did not reduce the award of costs to Watson.) First, Watson argues that the Magistrate Judge erred by reducing the award sua sponte. *See Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 721 (3d Cir.1989) (court may not lower award sua sponte). Watson's argument is unpersuasive in light of the fact that SEPTA urged the Magistrate Judge to award no fees at all. We fail to see how Watson can claim unfair surprise when SEPTA's motion plainly put her on notice regarding the propriety of her fee petition in relation to the limited success she achieved through litigation.

Next, Watson argues that the Magistrate Judge utilized an improper "proportionality" measure to limit fees. In *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1040 (3d Cir.1996), we held that a "court may not diminish counsel fees in a section 1983

action to maintain some ratio between the fees and the damages awarded." Here, the Magistrate Judge did not engage in the type of proportionality analysis that we disapproved in *Washington*. Rather, as expressly permitted by the Supreme Court, the Magistrate Judge adjusted the award in light of Watson's limited success. *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.").

Because the Magistrate Judge did not abuse its discretion in adjusting the award of fees, we decline to disturb her decision on this matter.

### III.

For the reasons explained above, we affirm.